**ILLINOIS TOOL WORKS, INC., Plaintiff,**

v.

**CONTINENTAL CAN COMPANY, Inc., Defendant.**

No. 65 C 2179.

United States District Court
N. D. Illinois, E. D.

July 12, 1967.

<hr />

James P. Hume and Granger Cook, Jr., Hume, Clement, Hume & Lee, Chicago, Ill., for plaintiff.

Fred S. Lockwood and John D. Dewey, Greist, Lockwood, Greenawalt & Dewey, Chicago, Ill., for defendant.

## MEMCRANDUM OPINION

DECKER, District Judge.

This is a suit for infringement of United States Patent No. 3,139,213 (" '213"), entitled "Nestable Cup," and for infringement of United States Patent No. 3,061,139 (" '139"), entitled "Self-Venting Package." The '213 patent was granted on June 30, 1964, upon an application originally filed on October 29, 1958, and divided on December 13, 1962, into the subject matter on which the '213 patent was granted and the subject matter on which United States Patent No. 3,091,360 was granted on May 28, 1963. The '139 patent was granted on October 30, 1962, upon an application filed on March 14, 1960. The applicant for both patents was Bryant Edwards, who has assigned all right, title and interest in both to plaintiff.

Plaintiff, Illinois Tool Works, Inc. ("ITW"), is a Delaware corporation, with its principal place of business and offices in Chicago, Illinois. Defendant, Continental Can Company, Inc. ("Continental Can"), is a New York corporation, with its principal place of business in New York and with a regular and established place of business in Chicago, Illinois.

In response to the complaint charging infringement, defendant filed an answer and counterclaim, asserting that the '213 and '139 patents are invalid and void and not infringed, and seeking a declaratory judgment under 28 U.S.C. §§ 2201, 2202 to this effect.

This court has jurisdiction of this case under 35 U.S.C. §§ 271 and 281 and under 28 U.S.C. §§ 1338(a) and 2201. Venue in this district is proper. The case was tried before the court on October 31 and November 1, 1966, and on November 7–18, 1966. This memorandum opinion, containing findings of fact and conclusions of law in accordance with Rule 52(a), Federal Rules of Civil Procedure, is based upon the evidence produced at the trial and upon the voluminous briefs filed by both parties. I have concluded that both the '213 patent and the '139 patent are valid and that Continental Can is guilty of infringement of both patents.

For convenience, this opinion will first set forth the general factual background concerning this suit and then will separately discuss the '213 and '139 patents and issues raised with respect to each of them.

* * *

In general, the subject matter of both patents involves thin-wall plastic cups and containers, used for containing beverages or food, and with the form of such cups and containers, together with thin plastic lids. These products are formed from sheets of plastic by the use of molds and a process known as thermoforming. ITW initially became interested in the container market in late 1956, and began to produce plastic drinking cups on a commercial basis in 1958. In 1959, ITW began to manufacture plastic cottage cheese containers and supplied plastic lids for these containers, through a subcontractor, commencing in 1960. Continental Can has been in the cup and container market for a number of years, and prior to 1956 manufactured and sold paper drinking cups and food containers. Continental Can manufactured and sold thin-wall plastic drinking cups for use in vending machines on a

sporadic basis from about 1956 through 1961. This product has been discontinued by Continental Can. In 1962 or 1963, Continental Can began to produce and sell plastic cottage cheese containers and lids and continues to do so at the present time. It is this latter product and activity by Continental Can which has directly given rise to this suit.

### The '213 Patent

#### 1. Subject Matter.

In general, the subject matter of U. S. Patent No. 3,139,213 is a thin-wall plastic container, particularly of the expendable or throw-away variety. Such containers are typically used in vending machines, to hold hot and cold beverages, and in the field of dairy product containers, most particularly for cottage cheese products. The '213 patent, entitled "Nestable Cup," relates to the use of a Z-shaped stacking ring configuration around the side wall of the container. The purpose of this stacking ring is to permit the containers to nest one inside the other in tubular, telescopic fashion for economic storage and shipment and for use in vending machines and other machinery, where containers are dropped singly from the bottom of such a tube of containers to be filled with the appropriate beverage or product. The stacking ring is intended to permit such stacking to the extent of maximum telescoping without allowing the containers to wedge together, thereby providing for ready separation. The stacking ring is also intended to take advantage of the inherent resiliency of the plastic material and to embody a quality of resiliency in the column of containers, for the purpose of preventing the splitting of cartons of such containers during shipment if accidently dropped, and otherwise to prevent problems arising from the rigidity of such columns of telescoped containers.

#### 2. Background and Issues in Suit.

ITW first became interested in the packaging or container field in 1956, and became acquainted at that time with Mr. Charles Politis of Athens, Greece, who was promoting a thermo-forming machine and process. ITW negotiated an option with Politis in 1956 for his machine and process, and conducted several market surveys to determine the potential commercial value of thin-wall plastic containers. Following these surveys and several inspections of the Politis operation in Greece, ITW in the first part of 1957 signed a contract with Politis for a machine. Subsequent to this time, ITW assigned to one of its engineers, Bryant Edwards, the task of designing a suitable cup. Edwards designed a cup having a continuous Z-stacker configuration located at its rim and beneath the overhang of the rim curl, and in June 1957, Edwards took this design to Athens where sample cups were produced on the Politis machine. Edwards returned in July 1957, and a Politis machine was shipped to ITW at about the same time. Further sample cups were produced on this machine, but these were found to be unsatisfactory. Edwards then completely redesigned the cup, coming up with a cup utilizing a continuous Z-stacker configuration around the side wall below the rim of the cup.

About this same time, Edwards also designed a cup utilizing the continuous Z-stacker configuration at the bottom of the cup. ITW submitted copies of this latter cup to Automatic Canteen, a major consumer of vending machine products, and in December 1957 Automatic Canteen gave ITW a verbal order for 1,000,000 of these cups, with minor modification. Molds were constructed and production begun early in 1958. In April 1958, ITW produced and shipped to Automatic Canteen 50,000 of these cups. However, the Politis machine was not efficient, and individual sorting and inspection of each cup was required. It was decided at this time to redesign the cup to provide for much greater production tolerances. The change consisted of adding an accentuated interrupted Z-stacker configuration to the existing Z-stacker ring at the bottom of the cup, and also further adding at spaced inter-

vals camming nibs having lower surfaces oblique to the lower edge of the ring. The balance of the Automatic Canteen order was filled from about May 1958 through the fall of that year, and it was filled first with the accentuated interrupted Z-stacker cup and later with that cup having in addition the camming nibs. ITW has continued to produce and sell the latter cup, in part because of the cost of changing its molds and tools.

ITW subsequently embodied the Z-stacker ring in an all-plastic tub for cottage cheese products in the dairy food industry. New molds were designed, and the tub contained a continuous Z-stacker configuration located on the side wall below the rim. In the summer of 1959, these tubs were produced and market tested by the Borden Company, and commercial production commenced shortly after that time. This production has continued to the present time, on the part of ITW as well as by its domestic and foreign licensees.

On November 29, 1957, Bryant Edwards filed application Serial No. 699,-678, for a thin-wall plastic "nestable cup" containing a continuous Z-stacker ring located around the side wall of the cup below the rim. Subsequently, on October 29, 1958, Edwards filed application Serial No. 769,057, also for a thin-wall plastic "nestable cup" with a continuous Z-stacker ring located on the side wall. Furthermore, this second application also described and claimed the interrupted accentuated Z-stacker ring and the camming nibs which were developed by Edwards in 1958 as a result of the commercial difficulties in producing cups to fill the Automatic Canteen order. Serial No. 769,057 was filed as a continuation-in-part of Serial No. 699,678 and Serial No. 699,678 was subsequently abandoned. After prolonged negotiation with respect to Serial No. 769,057, the Patent Office required a division under 35 U.S.C. § 121, and Serial No. 244,320 was filed on December 13, 1962. This application described and claimed a continuous Z-stacker ring, together with the additional feature of an oblique lower edge to this ring, located on the side wall of the cup. The application was successfully prosecuted, and the '213 patent was issued on June 30, 1964. The feature of the camming nibs, some of which possessed oblique lower edges, in conjunction with a Z-shaped stacking ring was embodied in U. S. Patent No. 3,091,360, issued to Bryant Edwards on May 28, 1963, and also entitled "Nestable Cup."

ITW alleges infringement of four of the eleven claims in the '213 patent. These are Claims 1, 5, 6 and 9. Claim 1 reads as follows:

"A one-piece nestable seamless container of thin-wall plastic material of substantially uniform thickness, comprising a bottom and a side-wall of predetermined thickness integral therewith, the configuration of said bottom in central axial cross-section being such as to enhance its resistance to deformation, said sidewall being joined to said bottom at a circumferential bottom margin and tapering generally upwardly and outwardly therefrom in diverging relation to an upper margin defining an open upper end, said sidewall being of substantial height to permit gripping thereof by a user, said upper margin having a rim of predetermined axial extent which is of sufficient increased lateral width relative to the thickness of the thin plastic sidewalls to lend required lateral strength at said open upper end, said sidewalls having circumferential stacking ring means formed therein, positioned below and spaced axially from said upper rim and having an axial extent greater than the axial extent of the rim portion and substantially less than the height of said sidewall, said stacking ring means including a circumferentially disposed intermediate support section having at its lower extremity circumferentially disposed externally projecting shoulder means and having at its upper extremity circumferentially disposed internal shoulder means projecting inwardly from the container sidewall and of smaller minimum diameter than the

maximum diameter of said external shoulder means and spaced upwardly from said bottom, said smaller diameter being less than said greater diameter by more than twice said sidewall thickness, said internal shoulder means adapted to form a shelf to coact with the complementary external shoulder means of a like container to positively limit the extent of telescopic association of said containers and the maximum diameter of the container in the vicinity of said external shoulder means being sufficiently less than the diameter of the internal container wall surface adjacent and above said internal shoulder means to counteract jamming of like containers when stacked, both said internal shoulder means and said external shoulder means being substantially circumferentially continuous, said intermediate section of the stacking means inclined inwardly and upwardly toward the cup axis to present the aforesaid inner shoulder means and to provide a thin-wall, resilient support therefore when axial pressure is applied there-against by the external shoulder means of a like, telescopically associated container."

Claim 5 reads:

"A container as set forth in claim 1 wherein at least one of said shoulder means has a surface associated therewith that is oblique relative to the container axis, the other shoulder means of an adjacent container being engageable therewith."

Claim 6 is identical with Claim 1, except that it provides that at least one of the shoulder means includes:

" * * * a circumferential surface oblique to the container axis, adapted for camming engagement with the other shoulder means of a like container telescopically associated therewith to enhance axial resiliency to a stack of containers in telescoped relation in response to axial pressures normally experienced by a stack of such containers."

Claim 9 reads:

"A container as set forth in claim 6 wherein the oblique surface in axial section presents a substantially straight line."

The alleged infringing product manufactured by Continental Can is a cottage cheese container, of thin-wall plastic material and with a single continuous Z-shaped stacking ring located on the side wall below the rim. Thus, the other claims of the '213 patent, which cover a Z-stacker ring located at the bottom of a cup and the use of a series of circumferential rings, together with a Z-stacker ring, on the side of the cup for gripping and possible heat-transfer purposes, are not involved in this suit.

Essentially, the defenses interposed by Continental Can are two-fold: (1) an assertion that the '213 patent is invalid and therefore cannot be infringed, and (2) an assertion that in any event, Continental Can's product does not infringe the patent. In support of the invalidity defense, Continental Can asserts a number of specific grounds.

The first ground is that of anticipation under 35 U.S.C. §§ 102(a) and 102 (b). With respect to the § 102(a) defense, Continental Can asserts, in particular, that experiments and developments of its own engineers involving thin-wall plastic containers prior to August 1957, the alleged conception date for the Edwards invention, constituted complete anticipations of this invention. Continental Can further asserts that various prior art patents and publications also constituted complete anticipations of the Edwards invention. Under § 102(b), Continental Can initially seeks to establish that, based upon the file wrapper history of the '213 patent, ITW is not entitled to the November 29, 1957, date or to the October 29, 1958, date as the date of application. According to this argument, the date of application is December 13, 1962. On this basis, Continental Can asserts that ITW's own commercial production and sale of cups to Automatic Canteen in 1957 and 1958 and sale of cottage cheese containers to

Borden Company commencing in 1959 constituted public use and placing on sale of the invention in this country more than one year prior to the date of the patent application, under § 102(b). Furthermore, Continental Can asserts that its own developments from 1956 to 1960 and other prior art patents and publications were public uses and sales more than one year prior to Edwards' application under § 102(b).

A second ground is that the '213 invention was obvious to a person having ordinary skill in the art at the time of the invention, under the provisions of 35 U.S.C. § 103. The prior art relied upon by Continental Can for this ground consists of its own developments and advertising from 1956 to 1960, together with a number of prior art patents. This same prior art is also relied upon with respect to the anticipation defense, under §§ 102(a) and 102(b), as previously noted.

A third ground consists of the assertion that the claims of the '213 patent fail to point out and to claim the subject matter of the invention, with the particularity and distinctness required by 35 U.S.C. § 112.

A fourth ground, based generally upon the developmental history of Edwards' various cup and container designs, together with the file wrapper of the '213 patent, lies in the assertion that the alleged novelty of the invention is so limited as to deprive it of "invention," and therefore that it was not patentable.

These various grounds raised by Continental Can with respect to the general defense of invalidity are further asserted affirmatively by Continental Can in support of its counterclaim for a declaratory judgment that the '213 patent in invalid.

Continental Can's non-infringement defense proceeds upon the theory that even if the '213 patent is valid, its product does not infringe. In particular, it is asserted by Continental Can that its product does not infringe Claims 5, 6 and 9 of the '213 patent in that the product does not have an oblique shoulder, as delineated in these claims. Further-

more, it is argued that the product does not have resiliency in the sense in which that word is employed in Claim 1 of the '213 patent, but rather that any resiliency in the product is simply inherent in the plastic material of which it is composed. Continental Can also raises the defense of file wrapper estoppel in connection with its argument of non-infringement. This defense is based upon Edwards' cancellation of certain claims following their rejection by the Patent Office, which claims were contained in the December 13, 1962, divisional application and Edwards' substitution of the present claims referring to "resiliency."

Before discussing in detail each of these defenses and the various grounds urged in support of them, it is necessary to define exactly the nature of the invention described and claimed in the '213 patent. This invention consists of a single circumferentially continuous Z-shaped stacking ring configuration, with an upper and a lower shoulder and a middle section inclined inwardly and upwardly relative to the cup axis, which stacking ring is located below the rim, on the side wall of the thin-wall plastic cup.

It is clear from the drawings, from the specification describing the drawings, and particularly from Claim 1 that this stacking ring is singular, is continuous around the cup, and is located as described above. Whether these features are significant with respect to patentability over prior art having double or interrupted rings, or locating the ring at a different place on the container, are issues which I will discuss at the appropriate place in this opinion, in connection with the respective prior art.

3. *The '213 Filing Date.*

Continental Can asserts that the '213 patent is wholly invalid because it was fully anticipated by prior art patents and publications, by ITW's own sales in 1958 and 1959 of cups and containers and by Continental Can's developmental activities and programs during the period of 1956 to 1960. Initially, the issue of the effective date of application for the '213 patent must be resolved. This

date is especially relevant with respect to which products and activities occurring between 1956 and 1960 should be considered, both as to the one-year time bar of § 102(b) and as to the date of invention for purposes of § 102(a). The date is in fact a crucial one for ITW, since it is clear that if the earliest date ITW is entitled to is the date of the divisional application—December 13, 1962— as contended by Continental Can, ITW's own solicitation of the order from Automatic Canteen in December 1957 would constitute a placing on sale, and the actual commercial production and shipment of the cups to Automatic Canteen in 1958, as well as the production and sale of cottage cheese tubs commencing in 1959, would constitute a public use of the invention "in this country, more than one year prior to the date of the application for patent in the United States," and thus invalidate the patent under § 102(b).

 ITW contends that the '213 patent is entitled to the November 29, 1957, filing date for Claim 1, and to the October 29, 1958, filing date for Claim 6 (and presumably for Claims 5 and 9 as well). This contention is based upon the provisions of 35 U.S.C. §§ 120, 121,[1] to the effect that a patent is entitled to the benefit of an earlier filed patent applica-

tion if three basic requirements are met: (1) co-pendency of applications, (2) cross-reference to the earlier application, and (3) continuity of disclosure. Both the co-pendency and cross-reference requirements were satisfied; however, Continental Can contends that there was no continuity of disclosure, insofar as the original application filed on November 29, 1957, made no reference to "resiliency" or to any similar characteristic. Furthermore, Continental Can argues that while the October 29, 1958, application referred to resiliency, it did so with respect to the camming nibs and not with respect to the Z-stacker ring. It is argued that not until the divisional application was filed on December 13, 1962, was resiliency related to the Z-stacker ring. Thus, Continental Can contends that there was no disclosure of resiliency to the extent required by 35 U.S.C. § 112, either in the November 29, 1957, application or in the October 29, 1958, application.

Continental Can relies upon the testimony of its expert witness Vandenburgh, who concluded from an examination of the various file wrappers that new matter was contained in the divisional application of December 13, 1962, in that resiliency was for the first time related to the Z-stacker ring. On this basis, Van-

---

1. § 120
 "An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application."
 § 121
 "If two or more independent and distinct inventions are claimed in one application, the Commissioner may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the require-

ments of section 120 of this title it shall be entitled to the benefit of the filing date of the original application. A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application. If a divisional application is directed solely to subject matter described and claimed in the original application as filed, the Commissioner may dispense with signing and execution by the inventor. The validity of a patent shall not be questioned for failure of the Commissioner to require the application to be restricted to one invention."

denburgh stated that this was not a proper division and that ITW was only entitled to this date as the date of filing the application for the '213 patent. Continental Can also relies upon the case of Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), in which the Supreme Court characterized as an "afterthought" the patentee's argument for the first time on appeal that one of the major advances of his invention with respect to a plough was its "free-flexing" quality throughout the shaft of the plough. However, the Court also found that this feature was not in fact significant in the patent and that the switching of the shank and hinge plate which permitted the "free-flexing" was obvious to anyone having ordinary skill in the prior art at the time of invention. Thus, the rejection of the argument of free-flexing in *John Deere* did not depend upon the "after-thought" characterization. Moreover, that case did not involve a continuation-in-part and division. I do not find the "afterthought" argument to be applicable to the present case, where the resiliency feature was presented to and argued before the Patent Office and where this feature was inherent in the design and drawings of the cup, which were identical in each application. See also Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549–550, 58 S.Ct. 662, 82 L.Ed. 1008 (1938).

The case of Indiana General Corp. v. Lockheed Aircraft Corp., 249 F.Supp. 809 (S.D.Calif.1966), which Continental Can also cites, can be distinguished. That case involved the filing of a continuation-in-part application following the original application, and the court did not allow the patentee the benefit of the earlier date on the grounds that the original application failed to disclose fully the "square" characteristic of the loop of the product. On this basis, the court held that the patentee's sales of the product at about the date of the original application constituted a commercial use more than one year prior to second application and therefore invalidated the patent un-

der § 102(b). The court stressed that the "square" characteristic of the loop of the product was the essence of the invention and held that even though the particular product having a square loop property was generally disclosed in the original application, this disclosure did not satisfy § 112 in that it did not disclose how the square loop characteristic was produced or how it was to be used or applied.

■ Under the circumstances of this case, I am convinced that the disclosure as to resiliency in the first two applications was sufficient to entitle ITW to the benefit of those dates, with respect to the various claims of the '213 patent. Specifically, Figs. 1–4 of the '213 patent which relate to Claim 1 and which depict a single continuous Z-shaped stacking ring located on the side wall below the rim of the cup are identical to Figs. 1–4 in the November 29, 1957, application and to Figs. 1–4 in the October 29, 1958, application. The same material, thickness, shape and location are involved in all three applications. More importantly, the drawings and descriptions in each application portray the same interrelationship and interaction between the cups with respect to the Z-stacker rings when the cups are telescoped together in a column. As Continental Can's expert Vandenburgh admitted, the property of resiliency claimed in the '213 patent was inherent and fully present in the earlier applications.

■ The inherency argument finds support in the familiar patent law principle that a patentee is entitled to all of the benefits and advantages of his patent, including uses and functions of which he was not aware at the time the patent was granted. See, e. g., Radio Corp. of America v. Radio Engineering Laboratories, 293 U.S. 1, 12–14, 54 S.Ct. 752, 78 L.Ed. 1453, reh. denied 293 U.S. 522, 55 S.Ct. 66, 79 L.Ed. 634 (1934); King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 875, 880 (7th Cir.), cert. denied 385 U.S. 817, 87 S.Ct. 38, 17 L.Ed.2d 56 (1966); Talon, Inc. v. Union Slide Fastener, Inc., 266 F.2d 731,

734 (9th Cir. 1959). While the court in the *Indiana General* case declined to apply this principle, it did so on the basis that the new use must result from the product or not involve a new principle or not be an unobvious use. In the present case, the resiliency feature or property does directly result from the structure, which is clearly described and depicted in both the November 29, 1957, application and in the October 29, 1958, application. No new principle or wholly unobvious use, as was involved in the *Indiana General* case, exists in this case. Furthermore, although these two applications both contained references to rigidity, it is clear that this rigidity was lateral rigidity, created by the use of numerous concentric rings or ridges about the cup, so as to prevent the cup from collapsing when grasped in a hand, and was not axial rigidity, so as to make a later claim of axial resiliency a possible contradiction and new principle, as Continental Can contends.

For these reasons, I hold that the requisite disclosure of resiliency existed in the November 29, 1957, application, and therefore that ITW is entitled to the benefit of that date as to the effective filing date for Claim 1 of its '213 patent, under § 120 and § 121. ITW is also entitled to the October 29, 1958, filing date for Claims 5, 6 and 9 of the '213 patent, insofar as the application filed on that date first fully described and disclosed the use of oblique shoulders with respect to the Z-stacker ring. However, even if ITW is not entitled to the November 29, 1957, date, it is entitled to the October 29, 1958, date for Claim 1, since the application of the latter date clearly stated:

"In all of the embodiments of the invention heretofore shown and described, the outlines of the cup are generally the same. In each instance, sections are provided for utilizing the inherent resiliency of the plastic, either directly, or by a wedging action or by both, whereby to impart a resilient characteristic to a stack of such cups telescoped together." [2]

When this statement is considered together with the drawings and descriptions which fully depicted the Z-stacker ring, it is clear that full disclosure for purposes of § 112 was present. Since none of ITW's acts in placing cups on sale or in actually producing and selling cups occurred prior to December 1957, the one-year time bar of § 102(b) does not invalidate the '213 patent, whether the November 29, 1957, date or the October 29, 1958, date is given effect.

### 4. *Anticipation.*

As the Supreme Court stated in the recent case of Graham v. John Deere Co., supra, 383 U.S. at 12, 86 S.Ct. at 691, the patentability of a particular device depends "upon three explicit conditions: novelty and utility as articulated and defined in § 101 and § 102, and nonobviousness * * * as set out in § 103." Continental Can does not raise lack of utility as a defense to the '213 patent in this suit, but does contend that the patent lacked both novelty and nonobviousness, and therefore is invalid. These tests are separate and involve different standards and considerations. In general, statutory novelty, as contained in § 102, requires a determination that the particular invention has not been made before, and therefore that it is in fact new. See generally Graham v. John Deere Co., supra, at 14, 86 S.Ct. 684 (quoting from H.R. Rep. No. 1923, 82d Cong., 2d Sess. at 7 (1952); S.Rep. No. 1979, 82d Cong., 2d Sess. at 6 (1952), U.S.Code Congressional and Administrative News, p. 2394).

The statutory requirement of novelty is set forth in § 102(a), which provides:

"A person shall be entitled to a patent unless—(a) the invention was known

---

2. Continental Can's witness Vandenburgh contended that this language in the October 29, 1958, application was a "mistake" on the part of the applicant and was inconsistent with other language referring to rigidity. I do not agree and find no inconsistency between references to lateral rigidity and to axial resiliency, as previously stated.

or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent."

Where the invention was previously known or used by others in this country, it is said to have been anticipated. Similarly, courts have employed the term anticipation in connection with § 102(b), which provides:

"A person shall be entitled to a patent unless—(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States".

Since § 102(b) embodies a one-year time bar and is most frequently raised where the patentee or applicant himself has used or sold his invention more than one year prior to his application for patent, it is probably more appropriate to consider this section as defining a situation under which an applicant loses his right to a patent and not as defining novelty. See, e. g., Application of Foster, 343 F.2d 980, 987–988 (C.C.P.A.1965). However, both §§ 102(a) and 102(b) involve prior knowledge, use or sale of *the invention* which is the subject matter of the patent, and therefore employ a similar standard as to the nature of the prior knowledge, use or sale with respect to its identity or similarity to the patented invention.[3] See generally 1 Deller's Walker on Patents §§ 77–82 (2d ed. 1964).

 Under both §§ 102(a) and 102 (b), the test of anticipation is framed in terms of the identity of the prior device with the later patented invention or invention on which a patent is sought. The test is frequently stated as "disclosure in the prior art of a thing substantially identical with the claimed invention." 1 Deller's Walker on Patents § 57 at 237 (2d ed. 1964). "Substantially identical" in turn has been defined as occurring where the two inventions "perform substantially the same function or office in substantially the same way, and produce substantially the same result." Delta Mfg. Co. v. E. L. Essley Mach. Co., 153 F.2d 905, 906–907 (7th Cir. 1946) (quoting from 48 Corpus Juris § 27 (1929)), cert. denied 328 U.S. 867, 66 S.Ct. 1376, 90 L.Ed. 1637 (1946). Furthermore, it has been generally stated that there is substantial identity of inventions where the subsequent invention does not involve inventive skill over the first but would have been obvious to a person having ordinary skill in the art. See, e. g., Duo-Flex Corp. v. Building Service Co., 322 F.2d 94, 96 (5th Cir. 1963); Ranco, Inc. v. Gwynn, 128 F.2d 437, 443 (6th Cir. 1942). These definitions would appear to be overly broad and to confuse anticipation with the separate test of invention, presently embodied in the statutory language of "non-obviousness" in § 103. It should be recognized that anticipation is a narrow technical defense, which does not raise for consideration all that the prior art discloses, but occurs only where the same or virtually identical device or invention has previously been disclosed. See, e. g., Monroe Auto Equipment Co. v. Heckethorn Mfg. & Sup. Co., 332 F.2d 406, 414–415 (6th Cir. 1964). As stated by the Court of Appeals for the Tenth Circuit:

"Anticipation is strictly a technical defense and unless all of the same elements are found in exactly the same situation and united in the same way to perform an identical function, there is no anticipation." McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381,

---

**3.** Of course, §§ 102(a) and 102(b) do not involve the same tests and reference points generally as to invalidity. Section 102 (a) directs the inquiry to a prior use or knowledge of others in this country at any time before the patent applicant's *date of invention*. Section 102(b) directs inquiry to a public use or a placing on sale in this country more than one year prior to the *date of application*. Thus, while a particular reference may invalidate a patent or patent application under both §§ 102(a) and 102(b), this is not necessarily the case. The point is that the relevant test of disclosure is the same under both sections.

398 (10th Cir. 1965), cert. denied 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966).

See also Stauffer v. Slenderella Systems of California, 254 F.2d 127, 128 (9th Cir. 1957).

In this case, where the same prior art knowledge, uses, patents and publications are cited both as anticipations under § 102 and as evidence of the obviousness of the '213 invention under § 103, it is important to distinguish between these separate defenses and to adhere to a narrow standard of virtual identity in every aspect of the inventions to find that an anticipation has occurred. Furthermore, such identity must exist in a single prior structure, patent or description, and it is not proper in this case to combine the various prior art references cited by Continental Can with respect to what each discloses. See, e. g., Monroe Auto Equipment Co. v. Heckethorn Mfg. & Sup. Co., supra, 332 F.2d at 414; Borkland v. Pedersen, 244 F.2d 501, 502 (7th Cir. 1957); but see Application of Foster, supra, 343 F.2d at 988–989. Since the '213 invention is embodied in a patent, the presumption of validity under 35 U.S.C. § 282 attaches, and the burden of proof rests upon Continental Can to show prior knowledge or use under § 102(a) or prior public use or sale under § 102(b) of the invention by "clear and cogent evidence." See, e. g., Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 382–383, 48 S.Ct. 380, 72 L.Ed. 610 (1928); Devex Corp. v. General Motors Corp., 321 F.2d 234, 238 (7th Cir.1963). Similarly, the burden is upon Continental Can in asserting anticipation on the basis of prior art patents and publications to sustain this claim by clear and convincing evidence. A patent or publication "is to be measured as anticipatory, not by what might be made out of it, but by what it clearly and definitely discloses." McCullough Tool Co. v. Well Surveys, Inc., supra, 343 F.2d at 398. Furthermore, "a prior patent or other publication to be an anticipation must bear within its four corners adequate directions for the practice of the patent

invalidated." Dewey & Almy Chemical Co. v. Mimex Co., 124 F.2d 986, 989 (2d Cir.1942).

In particular, Continental Can asserts that various developments, experiments and uses of plastic containers by its own engineers and employees in 1956 and 1957, prior to the alleged Edwards' conception date in August 1957, and "involving extensive development and use of stacking rings with Z configuration," completely invalidate the claims of the '213 patent. These activities, according to Continental Can, amounted to knowledge or use of the '213 invention by its engineers and employees in this country before Edwards' date of invention, within the meaning of § 102(a). ITW counters this argument with the assertion that these developments were incomplete or abandoned experiments, and thus were not anticipations under § 102(a). ITW further asserts that in any event none of these developments embodied the exact Edwards' invention and therefore were not anticipations or prior art.

Section 102(a) deals with knowledge or use of the invention by others prior to the date of invention by the applicant for patent. "Invention" is normally defined as consisting of conception plus reduction to practice of the particular device. See, e. g., Wright Aeronautical Corp. v. General Motors Corp., 166 F.2d 636, 640 (7th Cir. 1948); Stub v. United States, 63 F.Supp. 748, 749–750, 105 Ct. Cl. 397 (1946) cert. denied 329 U.S. 751, 67 S.Ct. 81, 91 L.Ed. 647 (1946). In this case, the evidence clearly reveals that Edwards completely revamped his cup design in August 1957, and produced the cup design which was subsequently embodied in the first '213 application, filed on November 29, 1957, and which is presently depicted as Figs. 1–4 in the patent. The evidence further reveals that sample cups of this design were actually produced on the Politis machine of ITW in September 1957. Thus, the date of invention for the '213 patent was no later than September 1957, which is consistent with the previous discussion of the effective date of filing to which ITW

is entitled.[4] It is only Continental Can's developmental activity prior to September 1957 which is relevant for purposes of prior knowledge or use under § 102 (a).

Continental Can's developmental activity in the area of plastic cups prior to September 1957 consisted of its 7¼ V cup program, extending from 1956 to 1957, and its 7AB cup program, extending from 1956 into 1958. These programs were primarily carried on through the efforts of Mr. William Miller, an engineer employed by Continental Can throughout this period and presently so employed. The purpose of the programs, as admitted by Miller, was to develop a plastic "cup, machinery, process, everything concerned with it, as soon as we could at the least amount of money," and to place this cup into commercial use. Transcript p. 1305. Numerous designs, samples and some production cups were produced in the course of these programs, and Continental Can engaged in advertising various cups and cup designs from 1957 to 1959. Continental Can also conducted developmental activity in 1956 and 1957 with respect to plastic food containers, including a ½ gallon ice cream container.

These various cups, cup designs and food containers employed a number of different stacking configurations. The first thin-wall plastic thermo-formed cups designed and produced by Continental Can in the first part of 1956 as a part of the 7¼ V cup program under Miller's direction were smooth-walled cups, modeled generally on the design of existing paper cups, with a rim-stacking configuration which was circumferentially continuous and in the shape of a "lazy S." In effect, this configuration was simply a groove in the inside of the side wall of the cup, located just below the rim. A cup in this general form and design was subsequently produced in commercial quantities and apparently sold for use in hot-drink vending machines in late 1956 and early 1957. However, such cups do not contain a circumferentially continuous single Z-shaped stacking ring located beneath the rim on the side wall of the cup, which is the subject matter of the '213 invention. Edwards, in his development of the '213 invention, began with a rim-stacking configuration, but abandoned this altogether for the side-wall configuration developed in August and September 1957. Miller's testimony at the trial revealed that the 7¼ V cups with rim-stackers were not successful and frequently jammed and telescoped.

Other cup designs in the 7¼ V cup program employed single side-wall continuous *vertical*, as opposed to Z-shaped, stacking configurations and stacking facilities inset into the bottom and spaced from the side wall of the cup. The evidence presented at the trial revealed that considerable jamming difficulties existed in the 7¼ V cups, due to side-wall nesting and the tendency of the cups to override the shoulders of the various stacking configurations. In other words, the stacking configurations were deficient and unacceptable for commercial use, a fact borne out by the subsequent variety of stacking designs which Miller investigated and tested in the various 7AB cups and cup designs.

In the 7AB cup developmental activity, Miller turned to the use of a double Z-stacker ring configuration. In the first model in this project, the "A" cup, the double ring was located at the rim, with the upper ring being continuous and the lower ring, immediately adjacent to the upper, being divided into three protruding segments. Some of these cups were produced and tested by Miller and other

4. This date is November 29, 1957, with respect to Claim 1 of the '213 patent. The filing date for Claims 5, 6 and 9 is October 29, 1958. However, since the basic subject matter of the '213 patent is fully covered and disclosed by Claim 1, for purposes of anticipation, I have chosen to treat the September 1957 and November 29, 1957, dates as the relevant ones, without considering separately the date of invention or the filing with respect to the oblique shoulder feature covered by Claims 5, 6 and 9.

employees of Continental Can in early 1957, but no commercial production occurred. A second model was the "B" cup, designed and produced in limited quantities in late 1956 and early 1957. The cup contained a stacking ring at the rim, below which was located a configuration composed of twelve semi-circular protrusions, generally inclined inwardly and upwardly relative to the axis of the cup. A third cup model was the "C" cup, designed and produced in limited quantities for internal testing in February 1957. These cups contained a stacking ring at the rim with a partial second ring consisting of four spaced segments located immediately below the upper ring. Both rings contained oblique lower shoulders. In June or July 1957, sample cups for testing were produced in limited quantity by Continental Can. These cups contained indented, semicircular intrusions about the base of the cup, in the side wall, which indentations were inclined upwardly and inwardly and were also slightly wider at the top than at the bottom. The cups also contained a single segmented (in four parts) protruding ring in the side wall of the cup below the rim, similar to the lower ring in the "C" cup model. In late spring of 1957, Miller designed and produced in limited quantity certain cups composed of paper with plastic bottoms. The bottoms contained indentations in the side walls for stacking purposes, similar to those in the all-plastic cups described above. These combination paper and plasic cups were never commercially produced and the project was abandoned in late 1957 as being too expensive.

During this period, two of the various cup designs developed in the course of the 7AB cup project were embodied in commercial projects. These cups were produced and presumably sold in the late spring or early summer of 1957. The first such cup, designated as the "D production cup," involved a rim-stacking configuration consisting of an upper ring and lower partial ring, both of which had oblique lower shoulders, and virtually identical to the configuration

on the "C" model cup. In May 1957 Continental Can advertised this cup in a national trade magazine. The second cup, the "7AB Special" cup, was a smooth-walled cup having a stacking configuration at the bottom of the side wall, which configuration consisted of twelve semicircular indented and inclined intrusions, as described previously. Apparently, Continental Can continued to experience difficulties with respect to jamming, telescoping, and axial rigidity of a column of cups in these and in the other various 7AB cup designs and models.

Continental Can also introduced evidence relating to developmental activity during the first seven or eight months of 1957 with respect to food containers composed of thin-wall thermo-formed plastic. These containers included a double Z-shaped stacking ring configuration similar to that just described in connection with the "D" production cup, except that the upper ring on the food container was not immediately adjacent to the rim and was not under the overhang of the rim curl. Rather, the upper ring was located on the side wall of the container below the rim. The second, segmented ring was located immediately below the upper ring. There was no evidence that any of these containers were actually produced in quantity or sold commercially at this time.

In 1957 Continental Can also designed and tested some models of a rectangular ½ gallon ice cream container composed of polyethylene and of polystyrene plastic. Some of these models employed a double rim stacking configuration with vertical mid-sections. Others contained double rim-stacking configurations which were generally Z-shaped, but vertical at the four corners of the container. This project never progressed beyond an initial design and testing phase.

With the possible exception of some of the food containers which had a single continuous Z-shape stacking ring located below the rim in the side wall, together with a lower segmented ring, none of the above-described designs or models was sufficiently identical to the '213 inven-

tion to have constituted an anticipation of that invention. Each of these designs contained significant and material differences from the '213 invention. In particular, the rim-stacking configuration which many of these designs employed was the same sort of configuration which Edwards designed in May 1957 and which he expressly abandoned in August 1957. The bottom stacking configurations, and various other segmented configurations, involving either intrusions or protrusions, were quite different from the '213 single continuous Z-shaped ring configuration. Miller himself admitted at the trial that none of his various plastic cup or food container designs, developed from 1956 through 1960, involved "a single side-wall continuous Z-shaped stacking ring." Transcript pp. 462, 464. Moreover, Miller on June 29, 1961, in connection with the proposed production of a 16 ounce cottage cheese container, stated in a letter: "Stacking will be controlled by the bottom section. I have reverted to the stacking design we used on the 7 ounce cups we made several years ago, correcting the one mistake we made. The bottom of the stacking band is now a solid ring."

Continental Can argues that once the basic geometry of a Z-stacking ring configuration is conceived and adopted, the use of a segmented, double ring, or other variation is merely a matter of choice and preference—only a difference of degree. Continental Can also argues that the exact geometry of the Z-stacking ring is dictated by the requirements of the plastic material and by the need to provide that the cup can be readily stripped from the mold. However, Miller's extensive design activity and his constant change of designs, without once actually producing the '213 invention, serves to counter these arguments. Miller was searching for a better design, and he finally employed a single side-wall continuous Z-shaped stacking ring in the cottage cheese containers, developed in 1962 and 1963. It was not merely a matter of preference or choice for him. Moreover, even if Continental Can's arguments are valid, the "differences of degree" involved between the various Miller designs and the '213 invention were sufficient to negative the status of any of the former as anticipations, within the narrow and technical definition of that term.

■■■■■ With the exception of the few cups which were actually produced and sold commercially, there is also a second basis for rejection of each of the various Miller cup designs and models as an anticipation of the '213 invention. These were merely experimental designs and models, used for internal tests and inspection by Continental Can. They did not constitute prior knowledge or use of the invention which was accessible to the public. See, e. g., Gayler v. Wilder, 51 U.S. (10 How.) 477, 13 L.Ed. 504 (1850). Although a single prior use may be sufficient to constitute an anticipation, Coffin v. Ogden, 85 U.S. (18 Wall.) 120, 124, 21 L.Ed. 821 (1873), and although this use need not be a commercial one, Corona Cord Tire Co. v. Dovan Chemical Corp., supra, 276 U.S. at 382–385, 48 S.Ct. 380, it must be an actual and complete use of the particular invention. In the technical sense of the phrase, there probably was the requisite "reduction to practice" of the various Miller cup designs for which molds were actually made and samples produced. However, these models were used solely for tests and experiments inside the laboratories of Continental Can, in the course of the development of commercial products. In no sense were the models considered as final products, but merely as steps along the path of designing a final product. Under these circumstances, it is clear that, with the exception of the few commercially produced cups, all of these various designs and models were merely experiments, subsequently and quickly abandoned for other designs and models. See, e, g., Connecticut Valley Enterprises, Inc. v. United States, 348 F.2d 949, 951–952 (Ct.Cl.1965). As such, they are without any status as either prior art, with respect to § 103, or anticipations, with re-

spect to §§ 102(a) and 102(b). See e. g., Gayler v. Wilder, supra.

At most, all of the evidence of Miller's extensive developments and various designs merely indicates that he was engaged at the time in a course of conduct aimed at designing and producing a practical commercial plastic vending cup and other plastic containers. He was experimenting with this end in mind, and it is clear that this was not achieved until 1962 or 1963, after ITW's extensive production and sale of cottage cheese containers embodying the '213 invention. See, e. g., The Telephone Cases, 126 U.S. 1, 547–567, 8 S.Ct. 778, 31 L.Ed. 863 (1888).

■ On the basis of the foregoing analysis and discussion, I conclude that none of Continental Can's developmental activity with respect to plastic cups and containers and occurring during 1956 or 1957 constituted an anticipation of the '213 invention. More specifically, none of these designs was knowledge or use prior to the date of invention of the '213 patent, within the meaning of § 102(a), and similarly none of them was a public use or sale more than one year prior to the filing date of the application for the '213 patent, within the meaning of § 102 (b). In fact, none of these designs appeared or was in any sense reduced to practice more than one year prior to the November 29, 1957, filing date, which pertains to Claim 1 and to the basic invention of the '213 patent, as I have previously found. Furthermore, none of the other prior art patents or publications, which will be discussed in detail in connection with Continental Can's defense of obviousness under § 103, was sufficiently identical to the '213 invention to have constituted an anticipation of that invention, under either § 102(a) or § 102 (b), as generally asserted by Continental Can. See, e. g., McCullough Tool Co. v. Well Surveys, Inc., supra, 343 F.2d at 398; Dewey & Almy Chemical Co. v. Mimex Co., supra, 124 F.2d at 989.

### 5. *Non-obviousness.*

■ Section 103 provides, in part:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

This section, added to the patent law in 1952, codified the existing judicially-created requirement of invention for patentability. See Graham v. John Deere Co., supra, 383 U.S. at 17, 86 S.Ct. 684. As stated by the Supreme Court in the *John Deere* case, this section involves a factual inquiry, under which "the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined." Graham v. John Deere Co., supra, at 17, 86 S.Ct. at 694. The relevant time with respect to which this analysis is to be conducted is the time of invention, and courts must be wary to avoid applying hindsight in light of subsequent knowledge or disclosures. See, e. g., Zegers v. Zegers, Inc., 365 F.2d 156, 159 (7th Cir. 1966). Furthermore the "apparent simplicity of an invention when viewed in retrospect" is not a test of invention or indicative of obviousness. Amp Inc. v. Vaco Products Co., 280 F.2d 518, 521 (7th Cir.), cert. denied 364 U.S. 921, 81 S.Ct. 286, 5 L.Ed.2d 260 (1960).

■■ An inventor is charged with knowledge of all that the prior art, taken as a whole, discloses with respect to the subject matter of the invention, and a person skilled in the art is further presumed to have had at his disposal all relevant prior art constructions and patents, as well as disclosures contained in pat-

ent applications pending before the Patent Office at the time of the filing of the patent in suit. See, e. g., Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965); Walker v. General Motors Corp., 362 F.2d 56, 60 (9th Cir. 1966).

 The patent is presumed to be valid. 35 U.S.C. § 282. A party asserting that a patent is invalid "has a heavy burden of establishing invalidity by clear and convincing evidence." Walt Disney Productions v. Fred A. Niles Communications Center, Inc. 369 F.2d 230, 234 (7th Cir. 1966). This presumption is strengthened where the validity of the patent is challenged on the basis of prior art cited by the Patent Office. Shumaker v. Gem Mfg. Co., 311 F.2d 273, 275 (7th Cir. 1962). However, "there is no presumption of validity as against prior art not before the patent office." Skirow v. Roberts Colonial House, Inc., 361 F.2d 388, 390 (7th Cir. 1966). Where the Patent Office cites some prior art, but not other equally relevant and similar prior art, the presumption is weakened only to the extent that the teaching of the uncited art is not disclosed in the cited art. See T. P. Laboratories v. Huge, 371 F.2d 231, 234–235 (7th Cir. 1966); Jaybee Mfg. Corp. v. Ajax Hardware Mfg. Corp., 287 F.2d 228, 229 (9th Cir. 1961).

In support of its general contention that the '213 patent is invalid because its subject matter was obvious to a person having ordinary skill in the art in 1957, Continental Can relies primarily upon eight patents, some of which were cited by the Patent Office in considering the '213 patent and some of which were co-pending with the '213 patent. Continental Can further contends that each of these "primary patents" contains a complete teaching of the '213 patent, and especially of Claims 1, 5, 6 and 9, which are involved in this suit, and thus offers these patents as anticipations under § 102, as well as evidence of obviousness under § 103.

The first patent relied upon by Continental Can is Geuder, U. S. Patent No. 795,437 (July 25, 1905). This patent discloses washtubs of heavy-gauge sheet metal, which contain a series of corrugated rings located on the side wall below the rim and circumferentially continuous about the side wall. These rings were designed to permit the nesting of the tubs, one inside another, without contact between the side walls of the tubs, for economic storage and shipment. In particular, the purpose of the rings (denominated "inturned and outturned beads" by the patentee) was to prevent wedging of the tubs or damage to them in separation, when stacked one inside the other, which wedging or damage was specifically caused by the protruding seam on the side of the tub, resulting from the joinder of the sheet metal. An "incidental advantage" of this construction, according to the patentee, was the protection of the drop handles of the tubs, which are located on the outside of the tub, just below the rim.

Although the Geuder patent was cited by the Patent Examiner who considered the October 29, 1958, application, there is no evidence that Geuder was specifically cited against the subject matter which eventually matured into the '213 patent and Geuder is not cited in the file of the '213 patent. Rather, Geuder was cited with respect to the subject matter of U. S. Patent No. 3,091,360, which was granted following the division of the October 29, 1958, application and which involved the use of camming nibs and protrusions in connection with a Z-shaped stacking ring on thin-wall thermo-formed plastic containers. Geuder is officially cited in the file on the '360 patent, and the patentee, before the Patent Office, specifically distinguished it (Application Serial No. 769,057, at pp. 89–90) on the basis that it did not involve downwardly extending protuberances (or nibs) which were essential in guiding light-weight plastic cups and in facilitating the entrance of air between such cups when stacked to allow gravitational separation in vending machines. Thus, it does not seem that Geuder was cited with respect to the '213 patent, and the presumption of

validity of the latter patent does not exist as against the disclosures of Geuder.

Nevertheless, Geuder contains significant differences from the subject matter of the '213 invention to the extent that it does not anticipate that invention and does not demonstrate that the subject matter of the '213 patent would have been obvious to a person having ordinary skill in the art in 1957. While Geuder does disclose the use of a stacking configuration wherein the lower shoulder of the inside tub rests upon the upper shoulder of the outside tub and side-wall nesting is prevented, this configuration is not Z-shaped. The Z-shaped characteristic is essential to the '213 patent, as Edwards testified, providing resiliency as well as non-jamming nesting of cups. Geuder is not concerned with these matters and in fact involves a non-analogous art and use. The purposes of the Geuder invention, as indicated, were substantially different from those of the '213 invention. A different material and means of creation of the product were involved. Geuder was not concerned with lightweight plastic cups and containers which are stacked in vending machines and other mechanical equipment and which are subjected to severe stress relative to their composition. Although Geuder generally involves a container and a stacking configuration, and for those reasons can be said to be pertinent prior art in the sense that a person skilled in the art would reasonably have been expected to look to Geuder for a solution, see, e. g., Graham v. John Deere Co., supra, 383 U.S. at 35, 86 S.Ct. 684, it does not supply this solution and does not render the solution obvious. Evidence to this effect is strongly shown in this case by Miller's various unsuccessful experiments and designs with plastic cups involving numerous stacking configurations, some of which were quite similar to Geuder. Miller was a person who was obviously and admittedly skilled in the art. Miller testified that he had, prior to 1957, seen tubs of the Geuder design and had actually designed equipment for producing such tubs. Miller further testified that in his opinion the '213 invention was suggested by Geuder. Yet, Miller, with all of his experience and skill, did not produce the '213 invention during the course of his extensive experimentation until 1962 or 1963, after ITW's cottage cheese container had been produced and sold in quantity and had met with extensive commercial success. At about that time, in 1962, Miller referred to his earlier experiments involving stacking rings as containing a "mistake" and changed his design to one virtually identical to the '213 patent, as embodied in ITW's cottage cheese containers.

A second "primary" patent relied upon by Continental Can is Pfalzgraf, U. S. Patent No. 1,324,432 (December 9, 1919). This patent also relates to heavy-gauge sheet metal washtubs, and discloses the use of a continuous Z-shaped ring about the circumference of the tub and located on the side wall below the rim. This ring contains an oblique upper and lower shoulder, and serves to prevent side-to-side rocking or tilting of the tubs when stacked one inside another. It does not function as a stacking device, since this feature is accomplished by the handles of the respective tubs. When the tubs are stacked in normal fashion, there is, in fact, no co-action between the respective rings, and the lower shoulder of the upper or inside tub does not rest upon the upper shoulder of the lower or outside tub.

The Pfalzgraf patent was not cited by the Patent Office in its consideration of the '213 patent. However, I do not find that Pfalzgraf's disclosures render the subject matter of the '213 patent obvious to one skilled in the art in 1957. The Z-configuration was clearly a secondary feature on the washtub and not used for stacking. In other respects, the Pfalzgraf patent is subject to the same deficiencies as the Geuder patent, in that it involves non-analogous subject matter where different purposes, uses and problems are involved than those in the '213 subject matter. Again, Miller testified that he had been familiar with washtubs

of the Pfalzgraf variety prior to his employment by Continental Can. However, Miller's own extensive experimentation in 1956 and 1957 with various stacking configurations and cup designs and his failure to achieve the '213 invention, in light of his conceded expertise and skill and his actual knowledge of the prior art product, are again strong evidence of the non-obviousness of the '213 invention with respect to the disclosures of the particular prior art product and patent. Furthermore, neither the Geuder nor Pfalzgraf patents, for the reasons stated, were sufficiently identical to the '213 invention to have constituted an anticipation of that invention, either under § 102(a) or § 102(b).

 A third primary patent cited by Continental Can is Amberg, U. S. Patent No. 2,707,588 (May 3, 1955). The Amberg patent discloses a paper lid used for sealing a paper container, and the combination of lid and container. Both the lid and the top of the container utilized a continuous Z-shaped configuration about the wall. However, there is no evidence that this was intended in any respect as a stacking device. Rather, as the patent plainly indicates, these configurations existed to permit the lid to seal and to interact tightly with the container. When so joined, the lid and container did not rest one upon the other, as do the '213 cups when in a stack or column, but nested tightly together, by contact of their respective side walls. The purpose of the configurations was entirely different from that in the '213 patent. Moreover, the structures themselves in the Amberg patent are significantly different from that of the '213 patent. Both of the structures in Amberg are located at the rim, a location which Edwards specifically abandoned in the '213 invention. Furthermore, the lid has no side wall at all other than the inclined part. Although this patent was not cited by the Patent Office in the file of the '213 patent, I do not find that its disclosures would have rendered the '213 invention obvious to a person having ordinary skill in the art in 1957, and furthermore, the

Amberg patent was not an anticipation of the '213 invention. With respect to the latter finding, the language of the Court of Appeals for the Seventh Circuit in Young Radiator Co. v. Modine Mfg. Co., 55 F.2d 545, 547 (7th Cir. 1931), is especially relevant:

"It is not sufficient to constitute anticipation that the device relied on for that purpose might, by modification, be made to accomplish the function performed by the patent in question if it were not so designated by its maker, nor adapted nor actually used for the performance of such function."

See also Topliff v. Topliff, 145 U.S. 156, 161, 12 S.Ct. 825, 36 L.Ed. 658 (1892); Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772, 779 (7th Cir. 1961).

A further patent relied upon by Continental Can is Nowak, U. S. Patent No. 2,749,572 (June 12, 1956), entitled "Method of Shaping Thermoplastic Sheets." As the title indicates, the Nowak patent primarily relates to and claims a method for forming thermoplastic sheets. Incidental to this purpose, the drawings of the product itself, in various stages of the thermo-forming, reveal that the product contains an "annular groove" about the rim of the product, located under the rim overhang. No reference is made in the patent with respect to stacking or otherwise as to its purpose. Some sort of indentation is also revealed about the side wall of the product at its bottom, but no reference is made to this configuration or to its purpose. Although the Nowak patent was not cited by the Patent Office in the '213 file wrapper and although Miller testified that in his opinion the top indentation was a Z-configuration, I cannot conclude from this evidence that the '213 invention would have been obvious to a person having ordinary skill in the art. The nature and purposes of the various configurations shown on some of the drawings accompanying Nowak are wholly matters of speculation. The patent itself was altogether unconcerned with these matters. Even if an inter-

pretation most favorable to Continental Can is adopted with respect to the top configuration in Nowak, this configuration is merely a Z-shaped rim stacking ring, of the sort Edwards expressly abandoned in August 1957. Moreover, the Nowak patent did not constitute an anticipation of the '213 invention.

Continental Can further cites Flack, U. S. Patent No. 2,879,917 (March 31, 1959) and Aldington, U. S. Patent No. 2,985,354 (May 23, 1961). Both of these patents were considered by the Patent Examiner in connection with the '213 patent and are cited in the file of that patent. The Flack patent, for "nestable plastic containers," reveals the use of a circumferentially continuous vertical stacking ring located at the rim about the side wall of the cup. This patent was distinguished from the '213 invention in argument before the Patent Office primarily on the basis that the stacking ring in it is vertical, thereby depriving the cups of resiliency when arranged in a stacked column. The spring-like quality, to which Edwards testified at the trial, resulting from the Z-shaped ring, is not present. Continental Can asserts that Edwards' testimony at the trial, that even a vertical stacking arrangement has some resiliency owing to the nature of the plastic material, is inconsistent with the distinction made before the Patent Office and is indicative that the Patent Office was misled in this regard. I do not find any merit in this argument. The '213 patent, as allowed by the Patent Office, clearly stated in the specification:

"It is therefore an object of this invention to provide a plastic cup which is configured to take advantage of the *inherent resiliency* of the plastic material for providing a resilient stack of cups." (Emphasis added.)

Certainly, any relatively thin plastic material, such as is utilized in the Flack patent or in the '213 patent, has an inherent resiliency, and the Patent Office was not misled. The distinction made before the Patent Office, however, and the subsequent allowance of the '213 patent, do strongly indicate its opinion that the Z-configuration alone, when used in such cups, was a patentable feature, which was not anticipated by the vertical rim-stacker in Flack and was not obvious in light of that configuration.

The Aldington patent, also cited by the Patent Office, reveals a plastic or paper lid for containers, entitled "Self-Conforming Cover for Containers." This lid has a side wall with a general Z-shape, the primary purpose of which is to interact with a protruding circumferential groove located below the rim of the particular container, in order to provide a tight seal. Incidental to this, the specification of the Aldington patent also states that this Z-configuration will facilitate stacking of the lids prior to application to the container, and will prevent jamming or wedging. However, all of this was before the Patent Office and the '213 patent was issued over the Aldington reference.[5] The presumption of validity of the '213 patent is strengthened in this respect, and Continental Can has not succeeded in overcoming this presumption. There is no reference in Aldington to resiliency of a stack of lids. Furthermore, the Z-configuration

5. Continental Can alleges that since counsel for Edwards distinguished Aldington on the basis that it was not concerned with jamming problems in stacked lids and since the specification in Aldington does specifically refer to this feature, the Patent Office was misled. I do not find any merit to this allegation. The prevention of jamming in Aldington is clearly a secondary feature in the patent, and, furthermore, there are significant differences between the '213 invention and Aldington, even considering this stacking use to be a major object of that patent. I find no merit in Continental Can's speculation that the Patent Examiner would not have granted the '213 patent if this feature in Aldington had been made clear to him or in the further speculation that "unfortunately the Examiner was not sufficiently familiar with the Aldington disclosure to be able to refute the misrepresentation."

comprises the entire side wall of the lid, resulting in different structural inter-relationships than in the '213 invention. Again, as with Flack, the fact that the Patent Office granted the '213 patent over Aldington strongly indicates its opinion that these distinctions are significant and patentable, and that the '213 invention was not obvious in light of Aldington and was not anticipated by Aldington.

Finally, Continental Can cites two patents of its own engineer, Miller—Miller, U. S. Patent No. 2,985,914 (May 30, 1961) and Miller, U. S. Patent No. 3,083,-888 (April 2, 1963).[6] The first of these patents related to a mold which formed the "7AB Special Cup," commercially produced in 1957, and involving a series of indented and inclined intrusions about the bottom of the side wall for stacking. The second patent related to the paper and plastic composite cup (paper with plastic bottom), which was designed and investigated by Miller in 1957, but never put into commercial production. This cup involved a segmented stacking configuration at the bottom of the side wall similar to that in the 7AB special cup. Neither patent was cited by the Patent Office in the '213 file. Both these designs have been discussed previously in this opinion, and I have concluded that they did not constitute anticipations for lack of substantial identity. Furthermore, the '213 patent would not have been obvious to a person having ordinary skill in the art in 1957, on the basis of these designs. In the first place, these designs, as embodied in the two Miller patents, are clearly not as pertinent to the '213 subject matter as the Flack and Aldington patents, which were considered by the Patent Office, and they disclose nothing over Flack and Aldington which is relevant to the '213 invention. In the second place, evidence of

non-obviousness is strongly supplied by Miller's failure, in light of his intimate knowledge of the Miller patents and in view of his skill in the art, to produce the '213 invention based on this and other subject matter before him in 1956 and 1957.

Continental Can further cites a number of "secondary patents" to illustrate "the extensive and widespread use of various forms of stacking ring configurations." None of these patents is nearly as pertinent to the '213 subject matter as the Flack or Aldington patents, both cited by the Patent Office, and none of the patents discloses any structure or feature which is significant with respect to the '213 subject matter beyond the disclosures of Flack or Aldington. Therefore, it is not necessary to discuss these patents with respect to nonobviousness under § 103. See, e. g., Briggs v. M & J Diesel Locomotive Filter Corp., 342 F.2d 573, 576–577 (7th Cir. 1965).

Continental Can also cites as prior art to prove the obviousness of the '213 invention its own extensive developmental activity in plastic container and cup designs from 1956 to 1958, conducted by its engineer Miller. This activity previously discussed in detail and rejected as anticipations, must also fail as evidence of the obviousness of the '213 invention. As previously stated, most of these various designs were merely experiments and were abandoned without the requisite public disclosure to give them the status of prior art. The four cups which were placed in commercial production and apparently sold, with limited success, have also been previously described and discussed in detail. These cups involved various rim groove, double ring, and bottom segmented stacking configurations. Neither the rim groove (Continental Can's 7¼ V cup, produced

---

6. The patents were issued upon applications filed subsequent to November 29, 1957, the filing date of the '213 patent. On this basis, ITW contends that the Miller patents are not prior art with respect to the '213 patent. However, the evidence revealed that Miller actually designed and produced sample cups in the designs covered by these patents in the late spring and early summer of 1957. Thus, reduction to practice and "invention" occurred as of that time, prior to the '213 date of invention.

and sold in late 1956, early 1957), nor the bottom stacking (the 7AB Special and composite paper-plastic cups, covered by the two Miller patents) is as pertinent as prior art as the Flack or Aldington patents, and disclose nothing of significance with respect to the '213 invention beyond those two patents cited by the Patent Office. These designs, when combined with any of the other prior art patents, or with Flack or Aldington, do not make the '213 invention obvious to a person having ordinary skill in the art, within the meaning of § 103.

The double ring cup produced commercially was the 7AB model "D production cup," which involved an upper Z-shaped stacking ring at the rim and under the rim overhang, as well as a lower segmented Z-shaped ring, both rings having oblique and rounded lower shoulders. The rim stacking configuration was expressly abandoned by Edwards in 1957, because of lack of success in producing an acceptable cup using this design. The use of a rim stacker, as opposed to stacking configuration located lower on the side wall, produces a different interrelationship between the cups when stacked than does the '213 configuration, and presumably leads to important differences in the functioning and use of the cups. The rim stacker was involved in the Flack patent, over which the '213 patent was granted, although the distinction of rim-stacking was not argued before the Patent Office. When this feature is combined with a lower segmented ring, there are significant differences in appearance, and presumably in operation, from the '213 invention. I cannot conclude that the '213 invention would have been obvious to a person having ordinary skill in the art on the basis of the "D production cup," either singly or in combination with other prior art patents and uses, as described above. This finding with respect to the "D production cup" is strengthened by the Patent Office's treatment of the Flack and Aldington patents, each of which, in their own way,

was as pertinent as the "D production cup."

My conclusions with respect to all of the relevant developmental activity of Continental Can during 1956 to 1958 are underscored by the failure of Miller, who was conducting these various experiments and designing the various stacking configurations, to produce the '213 invention. Miller was actually more than a person of ordinary skill in the art; he was an expert and possessed high skill in the particular art of designing thin-wall thermo-formed plastic cups, and containers. He had access to all of the developments, including those which were only "abandoned experiments." Some of the latter designs, particularly the food container designs involving an upper circumferentially continuous Z-shaped stacking ring located on the side wall below the rim, together with a lower segmented ring, were more pertinent to the '213 subject matter than any of the commercially produced cups, or than any of the prior art patents aside from Flack. Moreover, Miller had personal knowledge of the subject matter of a number of these prior art patents. Despite all of this knowledge and skill, Miller did not produce the '213 invention until 1962 or 1963, after ITW's cottage cheese containers had been placed upon the market and had met with commercial success. At that time, Miller switched to the '213 design of a single continuous Z-shaped stacking ring located on the side wall below the rim, and admitted that by doing so he had corrected "the one mistake" made in earlier designs.

Continental Can argues that on the basis of its various developmental activity "it is quite apparent that a person skilled in the art, such as Mr. Miller, would recognize the option of forming a Z-stacker ring either with circumferential continuity or circumferential interruptions as the use of such ring might require." Defendant's Post-Trial Brief, p. 38. The short answer to this argument is that Miller did not take this step at this time, leading to the conclusion, in light of his subsequent actions

and admissions, that the step was not apparent to him. Taking Miller as a standard for measuring the ordinary skill in the art, it must be concluded that the '213 invention was not obvious at the time, and therefore that the patent is not invalid under § 103.

The combination of the various prior art patents cited by Continental Can does not provide evidence of obviousness. The most pertinent single prior art patent would appear to be Flack, which was cited by the Patent Office. Geuder's series of corrugations for stacking washtubs does not add to Flack with respect to the '213 invention. Pfalzgraf's use of a Z-shaped ring below the rim of the washtub does add an important disclosure to Flack, but the force of this is dispelled by the relative unimportance of this feature in Pfalzgraf and its non-relation there to a stacking purpose. Similarly, Nowak may disclose a Z-shaped ring which would be significant when added to Flack, but again this feature in Nowak is unimportant and wholly undefined and unclaimed. Amberg involves only a lid seat, used to obtain a seal by tightly interacting with a container, and not referred to for stacking or other similar purposes. Aldington was cited by the Patent Office, together with Flack, and the combination of these patents was considered, before the '213 patent was granted. The presumption of its validity with respect to those patents is accordingly strengthened and not overcome by the evidence here. See, e. g., Shumaker v. Gem Mfg. Co., supra, 311 F.2d at 275. These various combinations do not demonstrate that the '213 invention was obvious. Again this conclusion is reinforced by using Miller as a standard of ordinary skill in the art.

ITW introduced evidence of the widespread commercial success of its cottage cheese containers over the last several years. Extensive sales of these containers have been made by ITW and by its licensees, both domestic and foreign. Several hundreds of thousands of dollars in royalties have been paid to ITW by the licensees. In general, ITW urges that this evidence is relevant as a "secondary factor" to show the non-obviousness of the '213 invention. It is customary to evaluate and apply evidence of such secondary factors as commercial success, long-felt need, and failure of others in this fashion, and it has been generally stated that "[t]hese factors [are] entitled to weight in determining whether the improvement amounted to invention and should, in a close case, tip the scales in favor of patentability." Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 (1944). See also Graham v. John Deere Co., supra, 383 U.S. at 17–18, 86 S.Ct. 684; Kennatrack Corp. v. Stanley Works, 314 F. 2d 164, 168–169 (7th Cir. 1963).

With the evidence on the issue of non-obviousness so clearly in favor of ITW, I find no need to add the weight of the admitted commercial success of the ITW's container in order to tip the scales in this case.

6. *Lack of Specificity.*

Continental Can asserts that the claims of the '213 patent are invalid for failure to comply with 35 U.S.C. § 112, which provides, in pertinent part:

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

In particular, it is asserted that the claims of the '213 patent are directed to an aggregation of elements which do not have a cooperative relationship and furthermore that they are vague and indefinite. I do not find any merit in either of these assertions.

There is a cooperative relationship between the various elements in the claims. The bottom, rim, side wall and stacking ring are all necessary parts of the cup and cooperate together to perform a single function. The Z-stacker configuration, which has previously been defined as the essence of the invention, co-acts with these other elements to provide a

practical and usable plastic cup or container. See, e. g., Church of Religious Science v. Kinkead Industries, Inc., 234 F.2d 573, 576 (7th Cir. 1956).

Continental Can contends that the terms "substantially uniform thickness," "positively limit," "inclined," "resilient support," "axial resiliency," and "oblique," as used in particular in Claims 1 and 6 of the '213 patent, are vague and indefinite. Edwards' extensive testimony at the trial with respect to the subject matter of the '213 patent serves to refute this argument. Furthermore, Miller had no difficulty in understanding and applying the terms of the '213 patent when, at the trial, he compared the various features of the patent with those disclosures of the prior art patents and uses. In the context of the specification and of the surrounding language in the respective claims, these terms are not so vague and indefinite as to fail under § 112. Moreover, the claims are not "functional," as generally alleged by Continental Can. The language in the claims does describe the structure of the subject matter of the patent and does not fall into the vice of merely describing what the patent does or what defect in the prior art it meets. See, e. g., General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402 (1938). Finally, the fact that the Patent Office fully considered and allowed these claims, as drawn, after extensive proceedings, is indicative of their sufficiency under § 112.

### 7. Lack of Invention Based on Limited Novelty.

Continental Can raises as a defense the contention that the '213 patent was so limited before the Patent Office, and consists of such a minor advance over the prior art, to be wholly devoid of invention. It is difficult to understand the legal basis for this contention. As the Supreme Court clearly stated in Graham v. John Deere Co., supra, the requirement of invention for patentability is contained in § 103, dealing with the non-obviousness of the subject matter

of the patent. As has been previously concluded, the particular subject matter of the '213 patent was not obvious under § 103. Furthermore, as has also been previously concluded, the subject matter was not anticipated; it was in fact new under § 102, and the requirement of novelty for patentability was present. The only additional requirement is that of utility, and Continental Can did not raise this issue.

It seems that Continental Can is attempting to apply as a standard of invention the concept of "inventive novelty." As has been recently and persuasively pointed out, this test was one created by 19th century judicial and treatise writers, and it would not seem to have survived the 1952 addition to § 103 to the patent statutes. See Kitch, Graham v. John Deere Co.: New Standards for Patents, 1966 Sup.Ct.Rev. 293. The decisions of the Supreme Court in Graham v. John Deere Co., supra, and in United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), which equated "invention" with "non-obviousness" and which rejected old sub-tests of invention such as new result, (see Walt Disney Productions v. Fred A. Niles Communications Center, Inc., supra, 369 F.2d at 234) make clear that "inventive novelty," as asserted by Continental Can in this case, is no longer a valid test of invention.

I agree with Continental Can that the '213 invention is quite limited—perhaps simply to a single circumferentially continuous Z-shaped stacking ring configuration located on the side of a container below the rim and used in thin-walled thermo-formed plastic containers. However, the Patent Office indicated by its issuance of the patent over the Flack and Aldington patents, and by its determination that the subject matters of the '213 and '360 patents were distinct and different, so as to require a division, that the '213 invention was, as limited, new and unobvious. On the basis of the extensive exhibits, testimony and documents offered in this case, I concur in this determination by the Patent Office.

*8. Infringement.*

The test of infringement of a patent is a narrow one. As stated by the Court of Appeals for the Seventh Circuit: "Neither a literal application of claim phraseology nor similarity of result is sufficient to establish infringement. There must be a real identity of means, operation, and result." Skirow v. Roberts Colonial House, Inc., supra, 361 F.2d at 391. In this case, it is clear that this narrow test is satisfied and that Continental Can's cottage cheese container infringes Claims 1, 5, 6 and 9 of the '213 patent.

In the first place, Claim 1 of the '213 patent reads literally on Continental Can's cottage cheese container. The latter is a thin-walled thermo-formed plastic container, with bottom, rim and outwardly sloping side walls, and having a single circumferentially continuous Z-shaped stacking ring configuration located on the side wall below the rim. Secondly, Continental Can's container is so identical in size, appearance, shape and location of features, including the Z-shaped stacking ring, as to be virtually undistinguishable from cottage cheese containers manufactured by ITW and its licensees, which incorporate the '213 patent. The "means, operation, and result" of these containers are identical to those of ITW.

Continental Can argues that Claim 1 stresses the "resiliency" feature and contends that its product does not contain such a feature, but only has that resiliency inherent in the nature of the plastic material. However, as Edwards testified, this feature results from the Z-shaped stacking ring configuration, which acts as a spring to absorb shock when the containers are stacked in a column. Certainly there is some inherent resiliency in the plastic material, and the '213 specification recognizes this fact. However, where its product is identical in every respect with the '213 patent, and the latter clearly claims resiliency, Continental Can cannot disclaim this feature as a part of its product

and seek to distinguish its product on this basis.

Continental Can renews here its contention that ITW is not entitled to the November 29, 1957, filing for Claim 1 of the '213 patent, on the basis that this application did not claim or specifically refer to resiliency. This contention has been previously discussed in this opinion, and it has been determined that resiliency was inherent in the November 29, 1957, application and that ITW is entitled to that date with respect to Claim 1 of the '213 patent.

Claims 5, 6 and 9 of the '213 patent are also infringed by Continental Can's cottage cheese container. These claims, as previously set forth, involve the use of one or more oblique shoulders in connection with the Z-shaped stacking ring. Edwards testified that in his opinion the lower shoulder of Continental Can's container was oblique, relative to the true horizontal. Admittedly, this deviation is slight and barely perceptible, especially when compared with the deviation on ITW's containers, which is at about a 45° angle. However, the camming feature of the oblique shoulder is also performed by a slight deviation, and the axial resiliency of a stack of containers is thereby enhanced. Continental Can's Director of Research for its Bondware Division, Mr. Richard Orthen, testified that its product did not use oblique shoulders, and that to his knowledge there was no deviation from the perpendicular (or horizontal). He further testified that the primary concern was with the prevention of jamming together of the containers, and that an oblique shoulder would merely act as a "lead-in or a funnel * * * to permit and actually guide the cup on top into a jamming position with the cup on the bottom." Transcript, p. 1816.

Nevertheless, a number of Miller's cup designs involved stacking rings having oblique shoulders, where the degree of obliqueness was no more apparent than in the presently manufactured cottage cheese container of Continental Can. Some of these cup designs were embodied

in commercial production by Continental Can, most particularly in the "D production cup" in late spring or early summer of 1957. Miller testified that the shoulders in these designs were oblique for purposes of achieving more direct centering of stacked cups. The deviation of the shoulders in these cups was also slight and the shoulders were somewhat rounded, as is the shoulder in the present Continental Can cottage cheese container. Moreover, as is indicated by these early cup designs, when Miller chose to make a shoulder absolutely horizontal, the shoulder was sharply defined and flat. Thus, I conclude that the lower shoulder of the Continental Can container is oblique within the meaning of that term in Claims 5, 6 and 9, and therefore the product infringes those claims. The fact that some of Continental Can's employees did not intend to utilize this feature and were not concerned with resiliency does not preclude this feature from existing and from acting in the fashion described by Edwards and in the '213 patent.

### The '139 Patent

#### 1. *Subject Matter.*

 As described in the specification, U. S. Patent No. 3,061,139 generally relates "to a package consisting of a container and closure therefor, and more particularly relates to a container and closure member which sealingly engage each other in a manner to provide a sanitary seal, but at the same time permits egress of gas from the interior of the container without dislocation of the closure member relative to the container." The '139 patent involves both the self-venting package, composed of a thin-wall plastic container and a separate snap-on and manually removable plastic lid, and the lid for use in this package. The container and lid normally contain separate sealing means and holding and venting means. The purpose of the package—and of the lid—is to provide for the egress of gas, when the package is filled with a gas-emitting substance, such as cottage cheese, without allowing the lid to "pop." This function is accomplished by use of holding and venting means, either in the design of the top of the container or in the design of the side-wall of the lid.

#### 2. *Background and Issues.*

Prior to ITW's entry into the container field, Continental Can and others had been producing paper containers, either plain or wax-coated, for the dairy food industry. These containers were capped by a lid or closure made of paper, metal or plastic.

In late summer or early fall of 1959, ITW began to produce sample cottage cheese containers, embodying the '213 Z-shaped stacking ring configuration. These containers were market tested by the Borden Company and designed to be used with a standard plastic lid produced by the Lily-Tulip Cup Corporation. These tests disclosed that considerable "popping" of the lids occurred, during handling, storage or shipment of the filled containers of cottage cheese. ITW's Bryant Edwards was assigned to find a solution to this problem. Edwards first designed a lid with vents in the bottom of the bead to prevent air from being trapped during capping of the container. When this lid did not fully solve the "popping" problem, Edwards designed a modified lid, having vents extending through the upper portions of the beads. Samples of these lids were produced by Edwards in late October 1959 and in early November 1959. In December 1959, Edwards added a secondary venting feature to the lid.

In 1960, ITW's sub-contractor, Kleer-Plastics Company, commenced manufacture of a modified variety of these lids, on molds and tooling owned by ITW, and this manufacture continued for about a year. At the conclusion of this period, Kleer-Plastics went out of business and ITW acquired the necessary machinery to manufacture the lid. Since this time, ITW has manufactured the lid, together with the container, and has also licensed domestic and foreign manu-

facturers to produce the lid as well as the container.

In late 1963 or early 1964, Continental Can commenced the manufacture and sale of plastic cottage cheese containers and lids. It has continuously manufactured and sold these products, with some modifications, since that time and does so at the present time. The decision to enter this particular market was made after Continental Can had closely studied the activities of ITW and others for several years and after it had observed the increased penetration of the plastic cottage cheese container in the market.

The application for the '139 patent was filed on March 14, 1960, and the patent issued on October 30, 1962. The patent contains 13 claims, and, in the present suit, ITW asserts that Continental Can's product, consisting of the container and lid, infringes Claim 1 and Claims 3 through 13. Claim 1 covers the general structure of a self-venting package, composed of a one-piece container with an open end, defined by a circumferential rim, and a one-piece snap-on manually removable lid, adapted to be inserted within and retained on the container. The container has a portion of its continuous side wall adjacent to the open end which is offset radially outwardly relative to the rest of the side wall. The lid itself is flat on the bottom and has a raised side wall with sealing means to co-act with the container means. The raised side wall on the lid has an outwardly and downwardly extending curl at the top, so that the lid fits inside the top of the container, with the outside of the lid side wall resting against the inside of the top portion of the container side wall and with the curl at the top of the lid side wall extending over and around the rim of the container. Either the lid side wall or the container side wall, where in contact with the lid side wall, has a combination holding and venting means portion, which is arranged so as to be "downstream" of the sealing means portion of these side walls (in effect, located above the sealing means portions). When gaseous material with-

in the container causes the sealing means to disengage each other, the holding and venting means function to hold the container and lid together while permitting egress of the gas under pressure.

Claim 3 deals with the package where the combination holding and venting means is integrally formed in the one-piece ,snap-on lid. Claims 4 and 5 deal with such a package with the sealing means located vertically below the holding and venting means and with the sealing means located below and separated from the radially outwardly extending portion of the container side wall, respectively.

Claims 6 through 11 of the '139 patent deal with several different particularized embodiments of the package and of the lid for use with the package. These differences are minor and each embodiment includes a plastic container having an internal circumferential groove located in its side wall adjacent to the upper open end and a plastic self-venting lid with various sealing and holding and venting configurations located in its side wall. The sealing is achieved by engagement between a protruding bead or other configuration at the bottom and sidewall edge of the lid with the lower shoulder of the groove in the container. Above this (or "downstream" of it) there are holding and venting means, normally on the lid, to permit gas to escape when pressure builds up but to prevent axial movement or dislodgement of the lid. Essentially, the operation of the package is the same in each claim: the pressure of the gas bows the bottom of the lid, breaking the seal. The holding and venting means then holds the lid in place while the gas escapes past it. As the pressure is relieved, the bottom of the lid returns to its normal position and the sealing means between the lid and container are again in contact. The holding and venting means are variously located opposite the upper shoulder of the container grooves, i. e., in the lid, or as a part of that groove, or opposite or as a part of the radially outwardly offset portion of the side wall of the contain-

er, which is adjacent to the upper edge. In all embodiments, these holding and venting means are located above (or "downstream" from) the sealing means. As depicted in Figure 1 of the '139 patent and as embodied in the exhibits of the packages and lids introduced at the trial, the holding means consists of an internal groove in the container and the bead of the lid, which two configurations fit together, and the venting means consists of the space between certain spaced and raised ribs or lugs located on the upper portion or edge of the bead on the lid.

Claims 7 and 10 deal with this general structure where a secondary holding and venting means is also provided, so that one such means exists on the bead and upper edge of the bead of the lid and the second exists on the side wall of the lid opposite the radially outwardly offset top portion of the container side wall. Alternatively, such secondary means can be located on this radially outwardly offset top portion. In the exhibits, this secondary holding and venting means consists of spaced ribs or lugs on the vertical section of the side wall of the lid, located above the bead and under the overhanging curl of the rim of the lid. According to the specification:

"The [secondary] rib portions * * * prevent a secondary seal * * *. Without the ribs, a seal in this area sometimes occurs, particularly if the filling mechanism for packaging the food stuffs might leave a slight film of milk or cream or similar substance which might cause a seal even though the dimensions of the lid are made such that contact will not ordinarily occur in this area."

Claim 12 of the '139 patent deals with a self-venting lid, and Claim 13 with a self-venting package. In contrast to the other claims of the patent, these two claims do not involve any sealing means on the lid or container. Thus, there is no sealing and resealing, but only a holding and venting means which permits continuous venting without axial movement or dislodgement of the lid.

Continental Can asserts generally as a defense and as a basis for its counterclaim that the '139 patent is invalid and therefore cannot be infringed. In particular, as grounds for this assertion of invalidity, Continental Can alleges first that Claims 12 and 13 of the '139 patent are invalid in that they were added to the patent application more than one year after the alleged invention had already been on sale and in public use and further in that these claims cover a concept of the alleged invention that was not a part of the original disclosure when the original application was filed on March 14, 1960. Secondly, Continental Can alleges that the '139 patent is completely invalid because it was fully anticipated by prior art patents and developments by Continental Can and others, under §§ 102(a) and 102(b), and further that the '139 patent was obvious to a person having ordinary skill in the art, under § 103. Finally, Continental Can asserts that in any case its product is significantly different from any of the various embodiments of the '139 patent, contained in the various claims of that patent, in this suit and therefore does not infringe the '139 patent.

3. *The Asserted Invalidity of Claims 12 and 13 of the '139 Patent.*

Basing its argument on the file wrapper history of the '139 patent, Continental Can initially asserts that Claims 12 and 13 of the patent are invalid, in that these claims added new material to the patent which was not disclosed in the original application and further that ITW first began to sell the invention disclosed and claimed in the '139 patent in about February 1960, which was more than one year prior to the addition of Claims 12 and 13 on March 22, 1961, and July 23, 1962, respectively. In particular, Continental Can asserts that the original application disclosed and dealt only with holding and venting means used in conjunction with sealing means, and that contact between the lid and container was essential to the invention disclosed in the original application. It is further asserted that Edwards, in argu-

ment before the Patent Office, specifically referred to the sealing feature and made no reference to continuous venting, as contained in Claims 12 and 13. Continental Can argues on the basis of these assertions that the two claims are invalid under § 102(b), since there was a placing on sale and public use of the invention more than one year prior to the addition of these claims. ITW counters this argument with the assertion that the subject matter of Claims 12 and 13 was fully disclosed by the original drawings and specification of the '139 patent, and that the subsequent claiming of this subject matter is entitled to the original filing date, March 14, 1960, which was less than one year after the first sales and uses of the '139 invention.

For legal support of this argument dealing with Claims 12 and 13 of the '139 patent, Continental Can relies upon the holding of the Supreme Court in Muncie Gear Works, Inc. v. Outboard, Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942). In Muncie Gear the Court held invalid certain claims relating to an "anti-cavitation plate" used to prevent air from being sucked into the propeller area of high-powered outboard motors, which claims had been added more than two years [7] after public use and sale of the particular motor with the plate by the patentee. The Court stated that the original application "in no way suggested the combination now asserted as * * * invention," and reviewed the drawings, specification and claims to reach this conclusion. 315 U.S. at 761, 62 S.Ct. at 866. Where the new claims were added, the patentee also filed an amendment to the specification dealing generally with this plate. Thus, the Court held that the intervening rights of the public, by virtue of the public use or sale of the device claimed by the particular claims, invalidated those claims.

The present situation is distinguishable on two grounds. In the first place, it is not alleged nor shown that ITW's sales of its package in 1960 involved continuously venting packages, as claimed in Claims 12 and 13. It would seem, from the evidence of ITW's initial use of wholly sealed packages, from Edwards' efforts to develop resealable packages, and from the fact that ITW has continuously sold and sells packages which seal, vent and reseal, as opposed to continuously venting packages, that its first sales in 1960 involved packages which sealed, vented and resealed. Continental Can's arguments, to the effect that the continuously venting package is altogether different and constituted new matter when added to the '139 application, defeat its own argument as to the applicability of Muncie Gear. Based on these arguments of new matter, there were no intervening public rights with respect to the continuously venting package by virtue of ITW's sales in 1960 since that particular device was not sold at that time. See. e. g., Sears, Roebuck & Co. v. Jones, 308 F.2d 705, 708 (10th Cir. 1962); Pursche v. Atlas Scraper & Engineering Co., 300 F.2d 467, 476 (9th Cir. 1962).

Even more importantly, it is clear that the present case does not fall within the ambit of Muncie Gear since the continuously venting feature was disclosed in the original '139 application. That case does not prevent amendments, to claim, specifically, features which were fully disclosed but not claimed in the original application. See, e. g., Engineering Development Laboratories v. Radio Corporation of America, 153 F.2d 523, 526 (2d Cir. 1946).

While Edwards was concerned with the problem of sealing, venting and resealing, and his first claims dealt with the use of sealing means together with holding and venting means, the use of the latter alone is disclosed and obvious from the drawings, specification and claims, as originally filed on March 14, 1960. The holding and venting means are separately described and depicted and are not necessarily restricted to combination

---

7. The present time-bar period under § 102(b) is one year.

with the sealing means. The concept of continuous venting is readily apparent in this application, and the situation of *Muncie Gear,* where the original application wholly failed to describe or to disclose the new use of a plate which was old in the art in combination with other features, does not exist here. See, e. g., Coats Loaders & Stackers, Inc. v. Henderson, 233 F.2d 915, 922–924 (6th Cir. 1956).

### 4. *Anticipation and Obviousness.*

In connection with the '139 patent, Continental Can cites various prior art patents and prior art uses, including its own activities and those of others, to invalidate the patent. Continental Can does not divide these prior references between those urged as full anticipations of the patent under §§ 102(a) and 102(b) and those urged as demonstrating the obviousness of the '139 invention to a person having ordinary skill in the art under § 103, as it did for the '213 patent, but urges these prior references generally, both as anticipations and as evidence of obviousness. Since these tests require a similar analysis of the prior art and comparison with the present patent, I will discuss all of the prior art at this time, with respect to both tests. Of course, as stated above with respect to the '213 patent, anticipation is a narrower and more stringent test than obviousness, requiring a virtual identity of the individual prior art reference with the subject matter of the present invention. It should also be noted that the discussion above, in connection with the '213 patent, of the presumption of validity of a patent and the strengthening or weakening of this presumption on the basis of prior art cited and not cited, respectively, by the Patent Office, fully applies here to the '139 patent. Similarly, the preceding discussion as to the scope of the prior art and the knowledge attributed to the inventor and to a person skilled in the art, for purposes of determining non-obviousness, is fully applicable here to the '139 patent.

Continental Can cites five "primary" prior art patents. The first of these is Mumford, U. S. Patent No. 2,953,272 (September 20, 1960), entitled "Closure Caps for Bottles and Jars." This patent relates to the use of thermoplastic caps on glass bottles and jars to provide venting means to permit the "maintenance of safe internal pressures without leakage of the contents." The cap is of the snap-on variety and designed to co-act with the glass walls of the bottle or jar so as to provide a seal. The cap is in several parts, consisting of a relatively heavy semi-rigid ring, an attaching skirt, a resilient concavo-convex diaphragm located within the ring, an annular radial flange formed internally as an integral part of the ring and an annular inclined wall connecting the radial flange and diaphragm to seal with the inner surface of the container mouth. The heavy ring fits over and around the top rim of the bottle or jar and forms a seal by its contact on the inside edge of the rim of the bottle or jar. The purpose of this cap is to seal, vent and reseal. When internal pressure rises in the bottle, the diaphragm is bowed upwards and causes the ring to come out of contact with the inside of the bottle rim and the seal is broken. The cap is still firmly attached by the pressure of the ring on the outside of the bottle below the rim. When the seal is broken, the gas escapes into certain channels which radiate outwardly over the rim and down the side of the bottle, which channels lie between the ring and the side of the bottle. These channels permit the gas to exit into the atmosphere, reducing pressure in the bottle. Thus, pressure on the diaphragm is reduced and it returns to its normal position, restoring the seal.

While Mumford involves generally a snap-on plastic cap with sealing means and with separate holding means and venting means "downstream" of the sealing means, it does not utilize an integral holding and venting means. Moreover, it does not deal with a grooved plastic container or with a one-piece cap. The cap

uses special grooves or channels and other special configurations for venting.

The second patent cited by Continental Can is Aldington, U. S. Patent No. 2,-985,354 (May 23, 1961), entitled "Self-Conforming Cover for Containers." This patent was cited by the Patent Office in the file of the '213 patent, and is also urged by Continental Can as an anticipation or evidence of the obviousness of that patent. As pertinent to the subject matter of the '139 patent, Aldington involves the use of a thin thermo-formed plastic cover (or of similar thin and flexible material) to close food containers, such as containers utilized for packaging ice cream, cottage cheese, potato salad and the like. This cover is designed to co-act with a groove about the top of the container side wall and accomplishes this by contact between the edge of the cover's side wall and bottom with the groove in the container side wall. The cover further has a raised side wall which makes additional contact with the inside of the container side wall, at the very top of the latter, about the inside of the rim, and the cover's side wall also extends over and about the rim of the container. The cover has an annular groove located in its bottom and forming a circle about the bottom near its edge. This groove permits the bottom or diaphragm to flex and bulge "in the event of an accidental overfill of the container, or in the event there is an unexpected air content in the container at the time of application of the cover." Neither the cover nor the container provide for, or refer to, any venting or resealing properties. Indeed, the patentee's stress in the specification to preventing leakage or spillage by firmly affixing the cover to the container "with a resilient pressure insuring annular sealing regions at a plurality of different locations" demonstrates his concern with a firm and unbroken seal.

The Doe patent, U. S. No. 2,286,070 (June 9, 1942), cited by Continental Can, relates to paper bottle caps for use on milk bottles. These caps are of the cover-all type, in that they fit over and around the rim of the bottle. The cap has a diaphragm or bottom, seated inside the bottle, and certain grooves leading from the upper side of the diaphragm to the outside. When, due to changes in temperature, the milk or cream in the bottle expands, this expansion will cause the diaphragm to rise, permitting the liquid to escape through notches in the side of the diaphragm and then through the grooves leading over the top of the cap and allowing the milk to run down the side of the bottle. The cap itself remains in position, due to its pressure on the outside of the bottle, and theoretically the diaphragm "snaps back and reseals the bottle, thereby preventing leakage and eliminating the possibility of contamination from the outside."[8]

Continental Can also cites Goodwin, U. S. Patent No. 2,279,263 (April 7, 1942) and Kempe, U. S. Patent No. 2,223,321 (November 26, 1940). Goodwin relates to a paper milk bottle cap, of the cover-all variety, having a diaphragm and a number of recesses or cavities formed on top of the diaphragm. When the liquid expands, these recesses permit the diaphragm to expand as well, and the milk or cream flows over the rim and down the side of the bottle. This cap does not reseal but is intended to remain in place to maintain the contents in a sanitary condition. Kempe relates to a bottle cap, presumably of paper, and means for making such, for use on milk bottles. The cap is also of the cover-all variety and has grooves for continuous venting of air or gas.

A number of "secondary" prior art patents dealing with various closures and venting means involving gaskets and other devices on different products were

---

8. There is some doubt as to whether Doe actually does reseal. Testimony by Continental Can's witness, Ward Coe, was to the effect that in this type of cap, the cap structure rises with venting and requires some external pressure to restore it to its original position.

also cited by Continental Can. However, these patents were relied upon generally to demonstrate "the advanced state of the art" in sealing and venting devices with respect to the obviousness of the '139 invention and not as anticipations. I do not find that these patents add anything pertinent to the '139 invention which is not covered and disclosed by the "primary patents" and therefore do not find it necessary to discuss them in detail. Continental Can does cite, as a secondary patent, Stewart, U. S. Patent No. 2,109,-805 (March 1, 1938), and contends that this patent, cited by the Patent Office in the '139 patent file, was the principal reference relied on by the Patent Office in considering the '139 patent. Continental Can argues from this contention that the Patent Office did not have the best or most pertinent prior art before it in considering the '139 patent, and that any of the "principal" prior art patents relied upon here are obviously more pertinent to the subject matter of the '139 patent than Stewart.

Stewart deals with a pry-off cap and container, with the cap being made of metal and the container made of glass. The cap is designed so that it can be snapped onto the container, with overlapping lugs which hook over a bead on the outside of the rim of the container. A rubber gasket inside the cap is brought into contact with the top of the rim of the container when the lugs snap the cap into place and thereby provides a seal. The primary use of this cap and container would appear to be in a canning process, where heat is applied after packaging, resulting in the development of high internal pressure. Such pressure causes the cap to lift slightly and the lugs to ride upwardly and outwardly. As the lugs do so, they exert a downward pressure upon the cap skirt and venting occurs between the gasket and the rim of the container. This venting is permitted by the fact that the gasket, having been compressed by the pressure of the cap in normal sealed position, is indented by the rim and, being composed of a low resilience material, returns slowly to its orig-inal flat form. The lugs subsequently snap back into position and the container is resealed.

While it can be argued, as Continental Can does, that Stewart is readily distinguishable and non-pertinent to the '139 subject matter in that Stewart involves a separate gasket and venting depends upon the special composition of this gasket, it is apparent that the general principle of the '139 patent is embodied in Stewart, as well as in Continental Can's "primary" prior art patents, such as Mumford and Doe. This principle is that of providing for sealing, venting and resealing, with the sealing means located "upstream" from the venting and holding means. The venting means and holding means are not combined in Stewart, as they are in the '139 patent, but neither are they combined in Mumford or Doe. Moreover, Stewart involves venting about the whole gasket and around the entire rim, and in that respect is more pertinent to the '139 patent than Mumford or Doe, which utilize special grooves and channels for venting. Thus, it can be readily argued that Stewart is as pertinent to the '139 subject matter as Mumford or Doe, and certainly more pertinent than Goodwin or Kempe, both of which contain all of the features above enumerated with respect to Mumford and Doe and in addition do not provide for resealing.

Moreover, the file wrapper of the '139 patent does not reveal that Stewart was the principal reference relied upon by the Patent Office, as contended by Continental Can. Stewart was cited with other patent references only against two claims in the second Official Action, and these claims were subsequently cancelled. The file wrapper does reveal that the Patent Office cited Flack, U. S. Patent No. 2,-972,432 (February 21, 1961), Hancock, U. S. Patent No. 2,881,368 (April 7, 1959), and Kroenert, U. S. Patent No. 2,858,955 (November 4, 1958) as principal references. These patents are at least as pertinent as Mumford, Doe and Aldington, and more pertinent than Goodwin or Kempe. Flack, in particular,

relates to one piece, snap-on, thin-wall thermo-plastic closure lids for use in closing paper food containers, such as cottage cheese containers. The containers have a groove and the bead of the lid co-acts with this groove, providing a seal. Furthermore, the bottom of the lid has an annular groove about its edge. Thus, Flack discloses every feature that Aldington does. Hancock relates to a venting cap for an electrolytic condenser, and is in several parts. On this basis, it is analogous to the milk bottle caps cited by Continental Can, and especially to Mumford or Doe.

Continental Can argues that the '139 patent is fully anticipated by Mumford or Doe or by Aldington, if the latter is modified to provide venting in light of Mumford or Doe. I do not find either Mumford or Doe to be an anticipation, under §§ 102(a) and 102(b), of the '139 patent. Both Mumford and Doe involve heavy glass bottles or jars without internal grooves together with cover-all caps having special channels or grooves for venting. These patents are clearly distinguishable from the '139 patent. Similarly, Aldington is distinguishable from the '139 patent, in that it involves no venting or resealing. Aldington is similar to the Lily-Tulip lids which ITW initially used on its cottage cheese containers and which, by "popping," provided the impetus for the '139 patent. Moreover, the proposed modification of Aldington would be contrary to the purposes of that invention and contrary to the concept and design of the inventor. Under these circumstances, Aldington does not anticipate the '139 patent. See, e. g., Topliff v. Topliff, supra, 145 U.S. at 161, 12 S.Ct. 825; Copease Mfg. Co. v. American Photocopy Equipment Co., supra, 298 F.2d at 779.

Furthermore, I do not find that the subject matter or any of the claims of the '139 patent would have been obvious on the basis of the above-cited prior art patents to a person having ordinary skill in the art in 1960, under § 103. Continental Can's Miller testified that in his opinion all of the structural features in the various claims of the '139 patent are present in the individual teachings of Mumford, of Doe and of the modified Aldington closure, and further that the modification of Aldington (to provide suitable vents) was clearly suggested by the teachings of either Mumford or Doe. However, such testimony would seem to be based on hindsight, especially in light of Miller's own extensive experiments with thermo-formed plastic containers and his unsuccessful efforts to produce an acceptable plastic lid, with venting, for use on hot beverage cups. Moreover, the citation by the Patent Office of the equally pertinent prior art patents such as Flack, Hancock and Stewart and its issuance of the '139 patent over these references indicates that its opinion, in 1962, were contrary to the position now taken by Miller. The milk bottle cap patents such as Goodwin and Kempe are distinctly different from the '139 invention and do not disclose any feature pertinent to the '139 invention which is not disclosed in Hancock or Stewart. Similarly, Hancock and Stewart fully meet Mumford and Doe, and the suggested modification of Aldington is fully met by Flack together with Hancock and Stewart. For these reasons, I find that the most pertinent prior art patents were before the Patent Office and were fully considered before the '139 patent was granted. None of these prior art patents, either those cited by the Patent Office or those relied upon by Continental Can, involved a one-piece, snap-on, thin-wall plastic lid with sealing means and combined holding and venting means, as in the '139 patent. Furthermore, the development of such a lid, or package, would not seem to have been obvious in 1960 from a combination of these various prior art patents. This conclusion is reinforced by the fact that the Patent Office considered the most pertinent prior art patents and reached the same conclusion. On this basis, the presumption of validity is fully in effect and has not been overcome by Continental Can.

Continental Can also introduced evidence of various prior art uses by it-

self and others, involving closures and lids. These uses are also cited both as anticipations and as evidence of the obviousness of the '139 invention. Three categories of such uses are cited. The first is Continental Can's own prior activities, in 1956 and 1957, relating to the development of plastic lids for its hot drink cups. These activities were carried on by Miller and involved the design and testing of a plastic lid having a bead to fit into the groove on the container and with vents in the bead. This lid was not found to be acceptable and was abandoned prior to any commercial use. Continental Can reverted to a simple lid with a hole in the center for its commercial product. In accordance with the principles previously discussed with respect to the '213 patent, it is clear that this vented lid did not advance beyond the stage of experimental use and was abandoned before it became a practical and useful product, even in the laboratory. As such, it is without status as prior art for purposes of anticipation or evidence of obviousness. See, e. g., Corona Cord Tire Co. v. Dovan Chemical Corp., supra; Gayler v. Wilder, supra.

The second category of prior uses relates to the use of vented milk bottle caps by the Smith-Lee Company. Smith-Lee has manufactured and sold such caps from 1945 through the present time. These caps are similar to those covered by the Kempe and Goodwin patents (Kempe was in fact an employee of Smith-Lee) and are similarly designed to raise slightly, thereby permitting venting to occur. Vents exist on the edge of the plug section, and on some styles a center vent also exists. However, these caps do not re-seal and do not have integral holding and venting means. They are not composed of plastic or of an analogous substance and are not designed to be used with thin-wall plastic containers. The same stresses, pressures and requirements which exist in the '139 patent are not involved. I do not find that these caps are any more pertinent than, or add any pertinent disclosure over, the Kempe or Goodwin patents and therefore fail as anticipations or as evidence of obviousness.

Continental Can further recites certain prior developments by the Sterling Seal Company, involving the design of vented metal lids for cottage cheese containers. In this connection, the evidence showed that Sterling had manufactured and sold metal lids for cottage cheese containers since 1955. It encountered lid-popping problems and a drawing showing the location of the vents through the bead of the lid was produced by an engineer of Dixie Cup as of October 9, 1959. Some samples were produced later in October and were sent to Sterling. The first commercial order was received by Sterling in January 1960, and vented lids were shipped in February 1960. It is clear from the evidence that these lids were still in the initial stages of experimentation in October 1959, and had not been reduced to practice at that time. There was considerable confusion between Sterling and Dixie Cup as to the exact purpose of the vents. However, even assuming that there was a sufficient reduction to practice so that these lids can be considered as prior art against the '139 patent, which would appear to have been reduced to practice in November or December of 1959, the Sterling lids are not sufficiently identical to constitute a prior use or knowledge of the '139 patent and furthermore do not necessarily render the '139 patent obvious, under § 103. This lid did not have an integral holding and venting means and its composition out of metal would give it significantly different characteristics and action than the '139 patent.[9]

9. Continental Can notes, and notes correctly, that the '139 patent does not specify the nature of the material from which the lid is composed. It does specify that the container is thin-wall plastic. However, in light of the emphasis throughout the patent prosecution and the present suit on the light-weight resilient nature of the lid, it is reasonable to interpret it as limited to one of plastic or closely similar material. A metal lid can be distinguished on this basis.

ITW also introduced evidence of the extensive commercial success of its cottage cheese package, and apparently also argued this point to the Patent Examiner. In light of the variety of other available and inexpensive packages for a product such as cottage cheese, this evidence does have probative value on the usefulness and desirability of the all-plastic container. Thus, it is entitled to some weight, as a secondary factor, as to the non-obviousness and novelty of the '139 patent. See, e. g., Graham v. John Deere Co., supra, 383 U.S. at 17–18, 86 S.Ct. 684; Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac Co., supra, 321 U.S. at 279, 64 S.Ct. 593.

In sum, then, I do not find that any of the various prior art patents or uses discussed above was sufficiently identical to the '139 patent to constitute an anticipation of that patent. The subject matter of the patent was in fact new and had never appeared before Edwards' development of the container and self-venting lid. Furthermore, I do not find that this prior art, both patents and uses, would have made the subject matter of the '139 patent obvious to a person having ordinary skill in the art in 1960. Assuming that the relevant art included all of the various closure devices cited, the combination of the various elements of these into the '139 invention was not obvious. Moreover, as the previous discussion reveals, not every element was present in the prior art. Many of these prior art patents and uses involved entirely different subject matter and problems. The adaptation of those solutions and devices to the new area of plastic containers cannot be said to have been obvious. To be sure, it can be argued that since this was a new area, no one had been previously faced with these particular problems and requirements. This does not overcome the fact that Edwards was the first to find the solution or the fact that the ITW container has since met with commercial success, and that other manufacturers, including Continental Can, have entered this market with similar products. As is the case with the '213 patent, I will agree that the '139 patent is limited and should be narrowly construed. Perhaps it covers only a one-piece, snap-on, thin-wall plastic lid, with sealing means and integral holding and venting means, when used with a thin-wall plastic container, together with such a package. However, as so limited, it is new and non-obvious, and constitutes a valuable and useful contribution to the art.

5. *Infringement.*

As previously stated, the test of infringement is a narrow one, requiring "a real identity of means, operation, and result." Skirow v. Roberts Colonial House, Inc., supra, 361 F.2d at 391. This test is satisfied with respect to the '139 patent, and it is clear that Continental Can's cottage cheese package and self-venting lid infringe Claims 1, 3–13 of the '139 patent, as alleged by ITW.

Continental Can's package consists of a thin-wall thermo-formed plastic container and lid. Both the container and the lid are in one piece. The container has a groove located on the inside of the side wall just below the rim, which engages the bead located on the bottom edge of the side wall of the lid. The top portion of the side wall of the container is "offset radially, outwardly relative to other portions" of the side wall. The lid is in one piece and is designed to be snapped on and manually removed. It has a bottom section and side wall, with the latter extending over and about the rim of the container so that the package is sanitary. Furthermore, and more importantly, the Continental Can lid has an integral holding and venting means, which is located "downstream" from the sealing means. The holding means consists of the lid bead, co-acting with the groove in the container, and the venting means consists of four grooves which cut into the side of the lid bead. Sealing is accomplished by co-action between the lower edge of the lid bead and the lower shoulder of the container groove. Finally, the Continental Can package also has a secondary venting means, composed of

four grooves cut into the radially outwardly extending side wall portion of the container, which function to permit venting and to prevent formation of a seal in that area. The package functions to permit venting without axial movement or dislodgment of the lid. These are the elements of the '139 patent and are claimed by Claims 1, 3–7 of that patent, as to the package, and by Claims 8–11, as to the lid. Continental Can's product is indistinguishable in appearance and is identical in the means employed.

Primarily, Continental Can argues that its product does not infringe Claims 1, 3–11 of the '139 patent since its product, by means of the grooves in the lid bead, vents continuously, and does not seal, vent and reseal. ITW admits that if this were the case, there would be no infringement of these claims, since they involve sealing, venting and resealing, but contends that Continental Can's product vents continuously only in the "dry" state, when empty or used with non-liquid or non-moist contents, and does seal, vent and reseal when used for its intended purpose—i. e., to hold cottage cheese. In support of the last contention, ITW introduced evidence of certain manometer tests indicating that most of Continental Can's packages when filled with cottage cheese, and thus in a "wet" state, did seal, vent and reseal.

First of all, I agree with ITW that the Continental Can package must be regarded in the context of its normal and intended use. This use is the holding of cottage cheese and similar dairy food products. The operation and status of the product when empty and not being put to its intended use or when used theoretically to hold a "dry" product, which also is not its intended and normal use, is irrelevant. Obviously, the '139 package also does not seal, vent and reseal when empty or used to hold a "dry" product.

The theory of ITW is that the cottage cheese in the Continental Can package produces moisture and gas which collect in the groove of the container and form a seal with the lower edge of the lid bead. Such a seal normally forms in the Continental Can package, despite the nature of its vents, and does so as a result of packing, handling and so forth. In fact, some of the cottage cheese itself normally spills or seeps into this groove. Since the groove and lid bead are in contact, this moisture need only close off the four small vents to accomplish a seal. I find that this is a completely plausible explanation and that it was fully borne out by the evidence of the sealing, venting and resealing presented in this case. In all respects, as to location, operation, principle and result, this functioning of Continental Can's package is identical to the '139 patent, and particularly to Claims 1, 3–11 of that patent. Therefore, this package infringes those claims. Finally, it is also clear that Continental Can's package infringes Claims 12 and 13 of the '139 patent, which do not require a sealing means but deal with a continuous venting and holding means, which prevents dislodgment of the lid. The bead of the lid in both the Continental Can package and Claims 12 and 13 functions as the primary means for such venting and holding,[10] and there is identity of means, operation and result.

\* \* \*

■■■ Claims 1, 5, 6 and 9 of the '213 patent are valid and are infringed by Continental Can. Claims 1, 3–13 of the '139 patent are also valid and infringed by Continental Can. In addition, while some evidence was offered by ITW in support of its contention that Continental Can copied the '213 and '139 patents, I do not find this evidence sufficient to justify a finding of bad faith or wanton and wilful infringement. Thus,

---

10. Continental Can does contend that holding is also accomplished on its product by contact between the upper sidewall section of its lid and the side of the container, in the area of secondary venting. However, it is clear that this is only "secondary" holding, and would not alone prevent axial movement or dislodgment of the lid.

I do not find that this case is a proper one for imposition of extraordinary damages under 35 U.S.C. § 284. Also, this is not an "exceptional case" justifying an award of attorney's fees under 35 U.S.C. § 285.

Plaintiff ITW is directed to prepare and present an appropriate judgment order on or before July 21, 1967.